

# VERITEXT
## LEGAL SOLUTIONS

Deposition of:
**Brad Weinsheimer**

*January 29, 2020*

In the Matter of:

**In the Matter of the Federal Bureau of Prisons Execution Protocol Cases**

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE FEDERAL   )  No. 19MC0145
BUREAU OF PRISONS' EXECUTION   )
PROTOCOL CASES.                )
-------------------------------)

- - -

Wednesday, January 29, 2020

- - -

Videotaped deposition of the OFFICE OF THE ATTORNEY GENERAL and the DEPARTMENT OF JUSTICE, by and through its designee, BRAD WEINSHEIMER, taken at the offices of Vinson & Elkins LLP, 2200 Pennsylvania Avenue NW, Suite 500 West, Washington, D.C. beginning at 9:06 a.m., before Nancy J. Martin, a Registered Merit Reporter, Certified Shorthand Reporter.

Page 114

1  A. There's more to that sentence, but what
2  you've read is correct.
3  Q. Okay. Who drafted this press release?
4  A. My understanding is that the press release
5  was drafted in conjunction with the Bureau of Prisons,
6  the Office of Public Affairs, and others who have been
7  involved in the process also commented on it, that is,
8  the Office of the Deputy Attorney General. The Office
9  of the Attorney General had comments, or at least
10 reviewed it, as did some of the litigating components
11 that were involved in litigation as relate to death
12 penalty issues.
13 Q. Okay.
14 A. They reviewed it. Whether they made specific
15 comments, I'm uncertain.
16 Q. When was the first -- when was the first
17 draft prepared?
18 A. I don't know.
19 Q. Do you know who prepared the first draft?
20 A. Based on the documents I've reviewed and the
21 individuals that I've consulted with, I believe the
22 first draft was prepared by individuals in BOP.

Page 115

1  Q. Okay. And who gave the ultimate approval for
2  the draft release?
3  A. It's my understanding that the ultimate
4  approval was the Attorney General.
5  Q. The July 25 press release does not announce
6  any changes to the main protocol itself -- correct? --
7  only the addendum to that protocol?
8  A. That's correct.
9  Q. And just to be clear, I think you said you
10 don't know whether the main protocol -- the 2019 main
11 protocol had been adopted by this time; is that right?
12 A. I think what I said is based on conversations
13 with BOP, I think it was around the same time, but I'm
14 not certain of the exact date or time frame.
15 Q. Okay. The press release includes execution
16 dates for five individuals; correct?
17 A. Correct.
18 Q. Who decided to schedule execution dates
19 before publicly announcing the addendum?
20 A. If I understand your question correctly,
21 you're proposing a scenario where there could have
22 been a release for the addendum and then a separate

Page 116

1  release about execution dates or no release at all.
2  I don't know that there was a decision in the
3  way that you've posited it.
4  Q. Okay. Who selected the five individuals to
5  be scheduled for execution?
6  A. Ultimately, the Attorney General.
7  Q. Who was involved in the decision? Who else
8  was involved in the decision about which five
9  individuals were scheduled for execution?
10 A. BOP, the Office of the Deputy
11 Attorney General, and the Office of the
12 Attorney General were involved in that decision-making
13 process.
14 Q. Was there an intent to select five inmates
15 for execution as opposed to a different number of
16 inmates?
17 A. I think it depends on how you sort of parse
18 your question. At the time that the Attorney General
19 selected the five, yes, there was an intention to
20 select five. If you're asking at the beginning of the
21 process was the number five selected, the answer is
22 no.

Page 117

1  Q. Why did the Attorney General decide to select
2  five individuals for execution?
3  A. The BOP began by creating a list of -- I
4  believe it was 14 individuals for whom they had
5  already exhausted their appellate and post-conviction
6  remedies, and there were no other impediments to
7  scheduling an execution; that is, there, at the time,
8  was no preliminary injunction or stay that prevented
9  the scheduling of the execution.
10 From that list the Attorney General selected
11 the five based on recommendations that he received.
12 And if you look at the press release itself, it
13 indicates that the five individuals had something in
14 common, which obviously was a factor the
15 Attorney General used in making that selection, and
16 that is that they were death row inmates convicted of
17 murdering, and in some cases torturing and raping the
18 most vulnerable in our society, children and the
19 elderly.
20 Q. So you mentioned that the procedural status
21 of the inmates' case was one factor that the BOP and
22 DOJ considered in scheduling the executions; is that

30 (Pages 114 - 117)

Page 118

1   correct?
2       A. That's correct.
3       Q. Okay.
4       A. When you say, "procedurally," you're
5   referring to had already exhausted the permissible
6   appeals and post-conviction remedies available to
7   them, and there was no preliminary injunction or stay
8   that prevented an execution date.
9       Q. Okay. Right. And these -- and my
10  understanding was that there were 14 inmates who met
11  that criteria; is that correct?
12      A. That's what I recall, based on the BOP list.
13      Q. Were the 5 inmates scheduled for execution
14  named among those 14?
15      A. Yes.
16      Q. So in selecting the 5 individuals scheduled
17  for execution from that list of 14, you mentioned that
18  DOJ considered, I believe it was the circumstances or
19  the nature of the crime; is that correct?
20      A. More specifically, that the 5 death row
21  inmates convicted of murdering, in some cases
22  torturing and raping, the most vulnerable in our

Page 119

1   society, children and the elderly.
2       Q. Did DOJ consider any other factors in
3   considering which inmates to schedule for execution?
4       A. There are other operational and practical
5   considerations that were included in the
6   decision-making process as well.
7       Q. What were those?
8       A. I believe there's a declaration from Rick
9   Winter in the underlying case where he talks about
10  some of the operational concerns that are required to
11  schedule an execution that include bringing together
12  the members of the execution team, coordinating with
13  state and local officials and others. Practical
14  considerations, obviously, also can include things
15  like litigation. I think actually in the BOP memo
16  there was some reference to litigation as well.
17          So those are among the operational and
18  practical concerns. There may be others that fall
19  into that category, but those are examples of some of
20  the operational and practical considerations that went
21  into the decision-making process.
22      Q. And did those operational and practical

Page 120

1   considerations affect the number of inmates that were
2   chosen -- or that were selected -- the number of
3   inmates selected to have their execution scheduled or
4   the identity of which inmates would have their
5   execution scheduled?
6       A. As to the identity part, it didn't have
7   anything to do with the identity. The identity was
8   based on the factor in the press release that I've
9   mentioned. In terms of the rest of your question,
10  based on the documents I've reviewed and the
11  individuals I've talked to, it did only to the extent
12  that, obviously, a determination could have been made
13  to select all 14, although I know in, I think, the
14  last line of the press release indicates that
15  additional executions will be scheduled at a later
16  date.
17          So obviously there was a contemplation of
18  scheduling further executions as well.
19      Q. Okay. So in terms of selecting which inmates
20  would be scheduled for execution, other than the
21  status of the criminal case and the factor outlined in
22  the press release, which is cases involving torture

Page 121

1   and rape in the most vulnerable in our society,
2   children and the elderly, were there other factors
3   that DOJ considered?
4       A. I've already indicated that there were
5   practical and operational concerns. You're trying to
6   separate those out. As I've indicated, when they --
7   when the process began, it wasn't like they said,
8   "Okay. Let find 5." So in terms of the identity,
9   practical and operational considerations didn't affect
10  choosing these 5.
11          In terms of whether there could have been
12  more, and therefore, that affects the identity of the
13  set that were scheduled, I can't say that that's not a
14  factor, because, again, the Attorney General could
15  have made the decision to schedule all 14.
16      Q. Right. But in terms of which 5 would be
17  scheduled, which 5 among the 14, there were no
18  additional factors the DOJ considered in that
19  selection; is that correct?
20      A. That question makes it sound like there was
21  an effort to select 5, but I don't agree there was an
22  effort to select 5. In the end, 5 were selected, and

31 (Pages 118 - 121)

Page 122

1  those 5 were selected because of the factor indicated
2  in the press release. They were convicted of
3  murdering, and in some cases, torturing and raping the
4  most vulnerable in our society, children and the
5  elderly.
6       So the factor relating to the vulnerability
7  of the victims, that was an important factor in making
8  the decision.
9       Q. Did DOJ consider other circumstances of the
10 crime other than those identified in the press
11 release?
12      A. Based on the individuals that I have talked
13 to and the documents that I've reviewed, there was an
14 effort to -- once the list of 14 had been created, to
15 determine whether there was an objective factor to be
16 used, and vulnerable victim was one of the factors
17 that they focused on, in part because it's in -- as an
18 aggravating factor in the death penalty statute.
19      Q. Were there other factors that were
20 considered?
21      A. I don't know -- as they went through the
22 process, I don't know whether they considered other

Page 123

1  factors. That's the factor that the Attorney General
2  identified when making his decision.
3       Q. Did DOJ consider the judicial circuit from
4  which the convictions arose in identifying which
5  inmates would be scheduled for execution?
6       A. I don't believe so.
7       Q. Did DOJ consider the views of the victim's
8  family on whether the inmate should be executed?
9       A. Throughout the criminal justice process, the
10 Department considers the views of victims and takes
11 the views of victims very seriously. Based on my
12 understanding, there wasn't a specific effort to reach
13 out to the victims' families of the 5 that were
14 selected.
15      Q. Did DOJ know, at the time that it scheduled
16 these executions, that the family members of Mr. Lee
17 had been out spoken in opposing Mr. Lee's execution?
18      A. Based on my knowledge and the things I've
19 reviewed, I'm unaware of the Department, at the time
20 of scheduling these specific executions, to consider
21 the views of these -- the family members of these
22 particular individuals. I don't know if it's true or

Page 124

1  not that all of Mr. Lee's family or relatives opposed
2  the death penalty or are opposed to it.
3       In terms of the factual predicate of your
4  question, I don't know if that's true not.
5       Q. I think that I misspoke my question.
6       Did DOJ know that family members of Mr. Lee's
7  victims had been outspoken in opposing Mr. Lee's
8  execution?
9       A. I think my answer is the same. Again, I'm
10 not certain of the predicate of your question. There
11 may be some of the victims who are outspoken. I don't
12 know if that applies to all the victims' families.
13 But, again, at the time that these 5 individuals were
14 selected, I'm not aware of any specific efforts by the
15 Department to reach out to the victims' families of
16 these 5 in particular.
17      Q. Okay. So in selecting which inmates would be
18 scheduled for execution, DOJ considered the age of the
19 victims; correct?
20      MR. PERKINS: Objection. Foundation.
21      THE WITNESS: What the DOJ considered was the
22 vulnerability of victims, and in this case, those who

Page 125

1  were convicted of murdering and in some cases
2  torturing and raping the most vulnerable in our
3  society, that is, children and elderly. Obviously
4  children are young people and elderly are older
5  people, but it was the vulnerability as reflected in
6  the -- as an aggravating factor in the statute. That
7  is what was focused upon.
8  BY MR. KOPPEL:
9       Q. So DOJ considered the age because it was
10 relevant to the vulnerability of the victim; is that
11 correct?
12      MR. PERKINS: Objection. Foundation.
13      THE WITNESS: My understanding is what DOJ
14 considered is vulnerable victims.
15 BY MR. KOPPEL:
16      Q. Did DOJ consider the sex or gender of the
17 victims?
18      A. Based on my consultations with individuals
19 and the documents I've reviewed, I'm unaware of any
20 effort to focus on the sex or gender -- is that what
21 you asked?
22      Q. Yeah.

32 (Pages 122 - 125)

Page 126

1  A. -- sex or gender of the victims or the
2  condemned.
3  Q. Okay. And in selecting inmates whose
4  executions would be scheduled, did DOJ consider the
5  race of the victim?
6  A. That would be the same answer. No.
7  Q. Okay. Did DOJ consider the race of the
8  inmate in scheduling executions?
9  A. That would be the same answer. No.
10 Q. Okay. I believe you already said that DOJ
11 did not consider the sex or gender of the inmate; is
12 that correct?
13 A. Correct, based on the answer I provided
14 earlier.
15 Q. And did DOJ consider the age of the inmate in
16 scheduling executions?
17     MR. PERKINS: Objection. Form. I withdraw
18 the objection.
19     THE WITNESS: Same answer. Based on the
20 individuals that I have talked to and the documents
21 I've reviewed, the age of the inmate was not a factor
22 that was considered.

Page 127

1  BY MR. KOPPEL:
2  Q. Are there other inmates on federal death row
3  with child or elderly victims who have exhausted their
4  appellate and post-conviction remedies?
5  A. My understanding is that BOP created a list
6  of the 14. Based on that 14, these 5 individuals were
7  selected because, as we've indicated, the impact on
8  vulnerable victims.
9     I don't know in terms of anybody else on
10 death row, whether they also murdered and in some
11 cases tortured and raped vulnerable victims.
12 Q. You said that the Attorney General made the
13 final decision as to which inmates would be scheduled
14 for execution; is that correct?
15 A. Yes, directed the BOP to schedule execution
16 dates for those 5.
17 Q. Right. Before making a final decision on
18 each of the first 5 inmates, did anyone review the
19 inmates' physical health?
20 A. Based on documents I reviewed and the
21 individuals I've talked to, I'm unaware of any effort
22 in that regard.

Page 128

1  Q. And do you know whether, before making a
2  final decision on each of the first 5 inmates, if
3  anyone reviewed the inmates' mental health?
4  A. That would be the same answer. I'm unaware
5  of any review of mental health.
6     MR. KOPPEL: Okay. Let's take a break for
7  lunch.
8     THE VIDEOGRAPHER: We're going off the
9  record. The time is 12:20 p.m.
10    (A recess was taken from 12:20 p.m.
11 and 1:25 p.m.)
12    THE VIDEOGRAPHER: We're back on the record.
13 The time is 1:25 p.m.
14 BY MR. KOPPEL:
15 Q. Was there anything you thought of over the
16 break that made you want to clarify any questions or
17 any answers that you've given so far?
18 A. No.
19 Q. Okay. Could you turn to Page -859 of the
20 administrative record. This is a November 2017 memo
21 to the Attorney General from BOP. Directing you to
22 Roman Numeral IV, the memo says that once protocol is

Page 129

1  adopted and BOP obtains pentobarbital, execution dates
2  may be set for 10 of the 60 inmates with federal death
3  sentences; correct?
4  A. Correct. That's what it says.
5  Q. And then there's a table there that lists 10
6  inmates, correct?
7  A. Correct.
8  Q. As far as you know, were these all of the
9  federal death row inmates whose appeals had been
10 exhausted at that time?
11 A. I don't know.
12 Q. And you said that there was a later list
13 of -- or I don't know if it was later. You said at
14 some point there was a list of 14 individuals, 14
15 inmates whose appeals have been exhausted and who
16 could be scheduled for execution; is that correct?
17 A. Correct. Their appeals and post-conviction
18 remedies have been exhausted, and there was no other
19 impediment to setting an execution date, such as a
20 preliminary injunction or a stay of the order of
21 execution.
22 Q. When was that list of 14 created?

33 (Pages 126 - 129)

Page 130

1  A. To the best of my understanding, it was
2  created sometime in the late spring or early summer of
3  2019.
4  Q. Okay. Is that -- do you know with more
5  specificity when it was provided to the office of the
6  Attorney General or Deputy Attorney General?
7  A. I know that it was provided to staff of the
8  Office of the Deputy Attorney General and the Attorney
9  General prior to the July 24 consideration of both the
10 addendum and the individuals. I don't know precisely
11 when.
12 Q. Was that list part of a larger document or
13 was it, you know, like this list here, was part of the
14 memorandum?
15 A. Yes. It was a brief memo from BOP and a list
16 of the 14 individuals. It may also have had
17 information about the underlying cases. I don't
18 remember specifically. There was some information
19 about each of the underlying cases of the 14.
20 Q. What was the subject of that memo?
21 A. The subject of the memo was 14 individuals.
22 You mean like subject line or what was the purpose of

Page 131

1  the memo?
2  Q. The purpose of the memo.
3  A. It was to identify for the Department the 14
4  individuals that BOP had determined had exhausted
5  their appellate and post-conviction remedies and for
6  whom there was no impediment to setting an execution
7  date.
8  Q. In identifying those 14 -- let me rephrase.
9  Were those 14 individuals identified in that
10 list all of the federal death row inmates that had
11 exhausted their appeals and had no other impediment to
12 execution, such as a stay?
13 A. My understanding is that BOP had conducted
14 that research, and their research suggested that those
15 were the individuals who had exhausted their remedies
16 and for whom there was no impediment to setting an
17 execution date.
18 Q. That was -- those 14 were the full set of
19 such individuals?
20 A. My understanding is based on BOP's research,
21 that was BOP's view.
22 Q. Okay. Did DOJ ask BOP to create that list?

Page 132

1  A. I don't know if DOJ asked BOP to create the
2  list. I know that there was discussion between DOJ
3  and BOP concerning setting execution dates once the
4  addendum was approved.
5  Q. What was the content of those discussions?
6  A. I don't know specifically what was the
7  content. I know that the subject was BOP identifying
8  those individuals for whom the -- they had exhausted
9  their appellate and post-conviction remedies, and
10 otherwise, there were no impediments so that decisions
11 could be made about setting up execution dates.
12 Q. In that memorandum from BOP that listed those
13 14 individuals, did BOP make any recommendation on --
14 as to which of those 14 should be scheduled for
15 execution?
16 A. No.
17 Q. Did it make any recommendation as to what
18 factors the Department of Justice should consider in
19 scheduling -- in selecting which inmates to schedule
20 for execution?
21 A. No.
22 MR. KOPPEL: We're going to request that you

Page 133

1  provide that memorandum.
2  MR. PERKINS: Noted.
3  BY MR. KOPPEL:
4  Q. You noted that the -- just a moment.
5  The July 25, 2019 press release states that
6  the individuals scheduled for execution, their cases
7  involved, in some cases, torture and rape against the
8  most vulnerable in our society, children and the
9  elderly; correct?
10 A. Yes, that's what it says.
11 Q. And you noted that that is an aggravating
12 factor?
13 A. Correct. That was my understanding, that
14 that was selected in part because it was an
15 aggravating factor in terms of vulnerable victims.
16 Q. And how did the Department of Justice decide
17 what it would consider to be a vulnerable victim?
18 A. Based on the documents I reviewed and the
19 individuals with whom I've spoken, I don't know if
20 there was any effort to define "vulnerable victim." I
21 think there was an effort to focus on vulnerable
22 victims because it was a factor in the aggravating

Page 134

1  factors, and the 5 that were selected all met that
2  objective; that is, they were involved, as the press
3  release says, in murdering and in some cases torturing
4  and raping the most vulnerable in our society,
5  children and the elderly.
6      Q. Why was this aggravating factor selected as a
7  criteria for selecting inmates as opposed to other
8  aggravating factors?
9      A. My understanding is that there was an effort
10 to find some objective factor in looking at the 14.
11 This was an aggravating factor that seemed to apply.
12 Beyond that, I don't know the extent to which other
13 factors were considered.
14     Q. Do you know if any other factors were
15 considered?
16     A. I do not.
17     Q. So you don't know, for example, if DOJ
18 considered selecting inmates based on whether their
19 victims were law enforcement officers?
20     A. No, I don't know one way or the other.
21     Q. Okay.
22     A. I would say, based on the documents I

Page 135

1  reviewed and the individuals I talked to, there was
2  nothing to suggest to me that that was a factor that
3  was considered, but I don't know the answer.
4      Q. And other than the 5 that were ultimately
5  scheduled for execution in this press release, were
6  there other inmates out of the 14 that were initially
7  given particular consideration for scheduling their
8  executions?
9      A. They were given consideration to the extent
10 that there were 14 on the list, and as I indicated
11 previously, one option that the Attorney General could
12 have chosen was to direct BOP to designate execution
13 dates for all 14. As indicated at the end of the
14 press release, it does indicate that additional
15 executions will be scheduled at a later date.
16     So there was some contemplation as relates to
17 sort of moving forward, what the next steps would be.
18     Q. Who, in particular, was involved in deciding
19 which of the 14 would be scheduled for execution?
20     A. There were individuals at BOP that were
21 involved to the extent they created the list. There
22 were individuals in the Office of the Deputy Attorney

Page 136

1  General and the Office of the Attorney General that
2  included the terms of involvement, that also included
3  the Deputy Attorney General and the Attorney General.
4      So at that time William Barr and the current
5  Deputy Attorney General, Jeff Rosen.
6      Q. And who else -- in terms of names, who else
7  in their offices was involved in that decision?
8      A. Those were the individuals that are involved
9  in it. Individuals in the Office of the Deputy
10 Attorney General and the Attorney General's office.
11     Q. Right. Other than the Attorney General and
12 the Deputy Attorney General, were there any other
13 people involved in making the decision?
14     A. Yes. There were other people in the Office
15 of the Deputy Attorney General and the Attorney
16 General in terms of discussing with BOP the list and
17 in formulating the recommendation.
18     Q. And who were they?
19     A. In the Attorney General's office, I believe
20 that Tim Shay was one of the people who was involved,
21 and I believe in the Deputy Attorney General, Paul
22 Perkins was one of the people involved.

Page 137

1      Q. And were there any written recommendations or
2  discussion created in determining who would be
3  scheduled for execution?
4      A. Well, there was the -- you mean in addition
5  to the BOP's list?
6      Q. Yeah.
7      A. Yes.
8      Q. And did any of those -- at any time was
9  anyone -- did anyone recommend someone other than the
10 5 that were ultimately scheduled for execution be
11 among the initial set that were scheduled for
12 execution?
13     A. Well, one of the considerations is whether it
14 should be the 14, for example.
15     Q. Was there any other subset -- at any time did
16 anyone recommend any other subset be scheduled for
17 execution?
18     A. "Subset" meaning of the 14 other than the 5?
19     Q. Yes.
20     A. Based on my review of documents and the
21 people that I have talked to, I don't believe there
22 was any other specific subset that was created.

35 (Pages 134 - 137)

Page 138

1  Q. And of the 14 who were on that list sent from
2  BOP to the Justice Department, were those 14 ranked in
3  order of priority or timing for when DOJ thought they
4  should be executed?
5  A. No. I'm unaware of any ranking or timing
6  other than at some point execution dates were
7  obviously set.
8  Q. And how did the Department of Justice decide
9  of the 5 who have been -- after deciding which 5
10 inmates to schedule for execution, how did the
11 Department of Justice decide which -- what order they
12 should be executed in?
13 A. My understanding is that BOP recommended
14 dates for execution that was discussed with the Office
15 of the Deputy Attorney General, and that was agreed
16 that that was an appropriate way to move forward.
17 Q. And so the first inmate scheduled for
18 execution was Daniel Lewis Lee scheduled for execution
19 on December 9, 2019; correct?
20 A. That's correct.
21 Q. How was it decided he would be executed
22 first?

Page 139

1  A. My understanding is that the recommendations
2  on dates came from BOP. So I don't know how that
3  selection was made.
4  Q. And you said -- I believe you said that in
5  the memo from BOP to DOJ lists identifying the 14
6  individuals, that memo also contained some details
7  about the crime of conviction; is that correct?
8  A. I believe there was, I'll call it a "fact
9  sheet" about each individual indicating in very brief
10 form the underlying facts of the case.
11 Q. And did those fact sheets identify the
12 individual's race?
13 A. I don't believe so.
14 Q. Did the fact sheets identify the individual's
15 age?
16 A. I don't know.
17 Q. So once the Attorney General had determined
18 which 5 inmates would be scheduled for execution, is
19 it your testimony that it was the Bureau of Prisons
20 that then determined the order and dates on which they
21 would be executed?
22 A. It's my understanding they made a

Page 140

1  recommendation in terms of the specific dates for
2  execution.
3  Q. And which inmates would be executed on those
4  dates?
5  A. Yes. That's my understanding.
6  Q. And so to your knowledge, DOJ is not aware of
7  how BOP selected those execution dates or the order in
8  which the inmates would be executed; is that correct?
9  MR. PERKINS: Objection. Foundation.
10 THE WITNESS: Based on the documents I've
11 reviewed and the individuals that I've spoken to, I
12 don't know how BOP went about setting that.
13 BY MR. KOPPEL:
14 Q. And the scheduling of execution dates, as set
15 out in the press release, was that, in terms of the
16 order and the dates, does that correspond to what BOP
17 recommended? In other words, was BOP's recommendation
18 on the dates and order accepted by DOJ?
19 A. When you say, "accepted by DOJ," DOJ agreed
20 that the recommendation for -- that BOP made seemed
21 appropriate, but it was largely left to BOP, as
22 indicated -- yeah.

Page 141

1  Q. So after BOP had made a recommendation of
2  dates and order, the Justice Department did not change
3  that order or the dates?
4  A. That's my understanding.
5  Q. Did DOJ give BOP any direction in terms of
6  how quickly they wanted the executions to occur, that
7  is, how soon?
8  A. I don't believe so based on the documents
9  I've reviewed and the individuals I've consulted. I
10 know there was discussion about the -- some of the
11 operational concerns that I discussed before, in terms
12 of the amount of time that would be necessary or best
13 in terms of scheduling.
14 So there may have been some discussion about
15 the operational concerns in terms of when the first
16 execution should be set.
17 Q. So is it your testimony that the decision to
18 schedule 3 executions for the week of December 9 was
19 BOP's decision and recommendation alone?
20 A. Yes, based on the -- my review of documents
21 and individuals with whom I've discussed, yes. The
22 decision, in terms of setting the dates for execution,

Page 142

1  was a decision that BOP made and recommended to the
2  Department.
3      Q. Okay. And if BOP had stated that it did not
4  think that more than one individual should be executed
5  in any given week, would DOJ have objected to that
6  recommendation?
7      A. Obviously that's a hypothetical question that
8  requires me to speculate. Based on the information
9  that I have, I don't have any reason to believe that
10 DOJ would have objected. BOP had the operational
11 concerns, and so it was up to them in terms of the
12 scheduling of dates.
13     Q. After the dates were first proposed by BOP,
14 am I correct in understanding those dates did not
15 change?
16     A. I'm unaware of them changing, obviously,
17 until the court's preliminary injunction.
18     Q. When was the decision about who would be
19 executed finalized?
20     A. My understanding is that was finalized on
21 July 24 after the Attorney General had directed the
22 acting director of BOP to approve the addendum.

Page 143

1      Q. I'm sorry. When was that again?
2      A. July 24.
3      Q. July 24.
4      A. You asked about the individuals; is that
5  correct?
6      Q. The individuals, yes.
7         So the individuals who would be scheduled for
8  execution -- the Attorney General finalized the
9  decision about who would be scheduled for execution on
10 July 24, the day before the press release was issued?
11     A. Correct.
12     Q. And when were the dates for the executions
13 finalized?
14     A. Based on the documents that I've viewed and
15 the people that I've talked to, it would be after that
16 in terms of finalizing the dates.
17     Q. The days were finalized, certainly, by
18 July 25; right?
19     A. Correct.
20     Q. So sometime between when the inmates were
21 selected on July 24, when this press release was
22 issued on July 25?

Page 144

1      A. In terms of when they were finalized, yes.
2      Q. Okay. And when were those dates first
3  proposed, the execution dates?
4      A. I don't know.
5      Q. If you could turn to Page -823 of the
6  administrative record. This is a -- I'll wait until
7  you get there.
8         (Pause in proceedings.)
9  BY MR. KOPPEL:
10     Q. This is a report from the Oklahoma Department
11 of Public Safety regarding the execution of Clayton D.
12 Lockett; is that correct?
13     A. Yes.
14     Q. Okay. Have you seen this document before?
15     A. I have.
16     Q. And this is an After-Action Report detailing
17 an investigation of Lockett's execution; is that
18 right?
19     A. That's right. I'm sorry. Repeat the
20 question.
21     Q. This is an After-Action Report detailing the
22 investigation of Lockett's execution?

Page 145

1      A. Correct.
2      Q. And was DOJ aware of this report when the
3  execution dates were scheduled?
4      A. This was a document that was referred to in
5  the administrative record summary that I talked about
6  before. Those were among the materials that were
7  available to the Department of Justice. So it was
8  aware to that extent.
9      Q. And when were these made available to the
10 Department of Justice?
11     A. That was in -- my understanding is that was
12 an ongoing process in terms of the documents that were
13 referred to in the summary. As I think I indicated
14 before, some of those things the Department would have
15 previously been aware of, like case law, for example.
16 Other things were developed over time but certainly
17 before the July 24 approval of the addendum.
18     Q. And Clayton Lockett's execution involved
19 complications; correct?
20     A. The only thing that I know about Clayton
21 Lockett's execution is what is contained in this
22 report. So I think the report speaks for itself. I