# Exhibit A

Complaint, Purkey DC Ford Matter (D.D.C. Nov. 26, 2019), ECF No. 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WESLEY IRA PURKEY | ) |
| Register Number 14679-045 | ) |
| U.S. Penitentiary Terre Haute | ) |
| Terre Haute, IN 47802 | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WILLIAM P. BARR | ) |
| Attorney General | ) |
| U.S. Department of Justice | ) |
| 950 Pennsylvania Avenue NW | ) |
| Washington, DC 20530; | ) |
| | ) |
| KATHLEEN HAWK SAWYER | ) |
| Acting Director | ) |
| Federal Bureau of Prisons | ) |
| U.S. Department of Justice | ) |
| 320 First St. NW | ) |
| Washington, DC 20534; | ) |
| | ) |
| and | ) |
| | ) |
| John Does 1-X | ) |
| | ) |
| Defendants. | ) |

## **Complaint**

## I.     PRELIMINARY STATEMENT

1.     Attorney General Barr has scheduled the execution of Mr. Wesley Purkey for

December 13, 2019 in the United States Penitentiary in Terre Haute, Indiana. Wesley Purkey is a

67-year-old man with Alzheimer's disease, a progressive form of dementia, and schizophrenia,

who has suffered multiple, extensive traumatic brain injuries over several decades.  These

assaults on his brain are layered on top of his life history of atrocious trauma, including the

1

repeated sexual abuse and molestation by those charged with caring for him as a child. As a result of his brain injuries, severe mental illness, and advancing disease, Mr. Purkey has significant memory impairments, grossly deteriorated cognitive function, paranoia, and delusions that render him unable to rationally understand the reason the United States seeks to execute him. As such, his execution would violate the Eighth Amendment prohibition against cruel and unusual punishment. *Madison v. Alabama*, 139 S.Ct. 718 (2019); *Panetti v. Quarterman,* 551 U.S. 930 (2007); *Ford v. Wainwright,* 477 U.S. 399 (1985).

## II.    NATURE OF CASE

2.    Plaintiff Wesley Ira Purkey brings this action for injunctive and declaratory relief from violations of the Eighth Amendment of the United States Constitution, U.S. Const. amend. VIII, and the Administrative Procedure Act ("APA"). 5 U.S.C. § 551 et seq.

3.    The Eighth Amendment's prohibition on cruel and unusual punishment bars the government from executing someone who is incompetent. *Panetti,* 551 U.S. at 934. *See also, Ford,* 477 U.S. at 401; *Madison*, 139 S.Ct. at 722. A condemned prisoner is deemed incompetent when he cannot rationally understand his punishment, or the reason for it. *Panetti*, 551 U.S. at 956.

4.    Mr. Purkey is incompetent to be executed. By virtue of his Alzheimer's disease, cognitive impairments, and severe mental illness he "lack[s] a rational understanding of the basis for his execution." Ex. 1 at 11-12.  He presents this Court with clear evidence of his incompetence through an expert evaluation finding him presently incompetent, as well as contemporaneous institutional records and psychiatric evaluations documenting decades of delusional behavior and rapidly progressing dementia.  Having made a "substantial threshold showing of insanity" the Eighth Amendment entitles him to a hearing on his claim. *Panetti*, 551

2

U.S. at 948-50. Carrying out Mr. Purkey's execution without affording him an opportunity to prove his incompetency would violate the Due Process Clause of the Fifth Amendment. U.S. Const. amend. V.

5. In this suit, Mr. Purkey does not seek relief from his sentence. Instead, he seeks to enjoin Defendants from carrying out his execution in a manner that violates his Eighth Amendment rights. A competency to be executed claim is not ripe until it is time to execute the sentence. *Panetti v. Quarterman, supra* at 947*, citing Stewart v. Martinez-Villareal,* 523 U.S. 637, 643-45 (1998)*.

### III. PARTIES

6. Plaintiff Wesley Purkey is a U.S. citizen currently in the custody of the Federal Bureau of Prisons (BOP), an agency of the United States Department of Justice (DOJ). He is confined at United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute") under a sentence of death, and is scheduled to be executed on December 13, 2019.

7. Defendant William P. Barr is the Attorney General of the United States. Mr. Purkey was remanded into the Attorney General's custody upon his conviction and the imposition of his death sentence. The Attorney General is the executive responsible for carrying out death sentences against federal prisoners. Defendant Barr is sued in his official capacity for the purpose of obtaining declaratory and injunctive relief.

8. Defendant Kathleen Hawk Sawyer is the Acting Director of the BOP. She is responsible for the supervision and operation of all federal prisons, including USP Terre Haute where Mr. Purkey has been confined since 2004. Defendant Sawyer is sued in her official capacity for the purpose of obtaining declaratory and injunctive relief.

3

9. John Does 1-10 are employed or retained by BOP to carry out Mr. Purkey's execution. Mr. Purkey does not know, and the Attorney General and the BOP have not revealed, their identities or positions. They are sued in their official capacities for the purpose of obtaining declaratory and injunctive relief.

10. Defendants are acting, and at all relevant times were acting, in their respective official capacities with respect to all acts described herein, and were in each instance acting under the color or authority of federal law. Upon information and belief, unless preliminarily enjoined, each of the Defendants intends to act in his or her official capacity and under the color or authority of federal law in executing Mr. Purkey, in violation of his statutory and constitutional rights.

## IV. JURISDICTION AND VENUE

11. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the action arises under the laws and Constitution of the United States. Specifically, Mr. Purkey seeks prospective, equitable relief directly under the Fifth, Sixth and Eighth Amendments of the Constitution, as well as declaratory relief under 28 U.S.C. § 2201(1) and 28 U.S.C. § 2202. Judicial review of the agency action is authorized by the APA, 5 U.S.C. §§ 702, 704, and 706.

12. Venue is proper in this District under 28 U.S.C. § 1391(e) because Defendants Barr and Sawyer are officers of the United States acting in their official capacities who reside in this District, and the BOP is an agency of the United States. Additionally, several key witnesses in this case, including Dr. Jonathan DeRight and mitigation specialists John Fox and Dr. Elizabeth Vartkessian, reside in close proximity to the District of Columbia.

## V. PROCEDURAL HISTORY

13.     On November 5, 2003, a jury found Mr. Purkey guilty of the murder and kidnapping of Jennifer Long and sentenced him to death in the Western District of Missouri. *United States v. Purkey*, Case No. 4:01-cr-00308-FJG at Dkt. 1; Dkt. 461; Dkt. 487. The trial court formally imposed this sentence on January 23, 2004. *Id*., Dkt. 505. The Court of Appeals for the Eighth Circuit affirmed his conviction and sentence on direct appeal in 2005. *See United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005), *cert. denied* 549 U.S. 975 (2006). His motion under 28 U.S.C. § 2255 was denied in 2009, Ex. 42, and affirmed by the Eighth Circuit in 2013. *See Purkey v. United States*, 729 F.3d 860 (8th Cir. 2013), *cert. denied* 135 S.Ct. 355 (2014). To reiterate, in this suit, Mr. Purkey does not seek relief from his sentence.

14.     In 2016, neuropsychological testing conducted at the request of federal defense counsel Michelle Law and Rebecca Woodman revealed that Mr. Purkey was suffering from progressive dementia, most likely Alzheimer's disease, and frontal lobe deficits. The testing revealed that Mr. Purkey had experienced significant declines in both memory and executive functioning since previous testing in 2003. Ex. 9 at 88. A follow-up report in 2018 revealed that Mr. Purkey's condition had continued to deteriorate since that time, and recommended further neurology work-up, including brain imaging, and a reassessment of his neurological status. Ex. 12 at 120.

15.     On July 25, 2019, Defendant Barr scheduled an execution date of Mr. Purkey for December 13, 2019.

16.     In August 2019, Mr. Purkey filed a petition under 28 U.S.C. § 2241 alleging, in part, substantial claims of ineffective assistance of his trial counsel. *Purkey v. Warden et al.*, Case No. 2:19-cv-414-JPH-DLP, Dkt 1; Dkt. 23 (Amended Petition). These claims have never

5

been scrutinized by any court because Mr. Purkey's initial-review post-conviction counsel failed to investigate and present them in his motion under 28 U.S.C. § 2255. *See Martinez v. Ryan*, 566 U.S. 1, 14 (2012) (holding that procedural default can be overcome in federal habeas where post-conviction counsel performed ineffectively); *Trevino v. Thaler*, 569 U.S. 413 (2013) (based on the principles of *Martinez*, courts can excuse procedural default even in a jurisdiction that does not require ineffective assistance claims to be raised on initial collateral review). The Southern District of Indiana dismissed Mr. Purkey's § 2241 petition for lack of jurisdiction on November 20, 2019.  Case No. 2:19-cv-414, Dkt. 76.  Mr. Purkey filed a notice of appeal on November 22, 2019. *Id.*, Dkt. 78.

17.  During the pendency of Mr. Purkey's § 2241 in 2019, counsel raised concerns about Mr. Purkey's competency to work with his counsel and his competency to be executed. Case No. 2:19-cv-414, Dkt. 55, 57, 61 and 63 (*Ex Parte*). To assist in addressing these concerns, counsel sought a medical order for recommended brain imaging based on Mr. Purkey's history of cognitive deficits and the need to rule out an intracranial process. *See* Case No. 2:19-cv-414, Dkt. 56-1 (*Ex Parte*). Counsel contacted appropriate authorities at USP Terre Haute to address institutional issues associated with carrying out such testing, and were advised that such testing would require a court order. Accordingly, counsel filed an *ex parte* motion for brain imaging in October 2019, requesting a Court order directing that such testing occur at no cost to the Court. Case No. 2:19-cv-414, Dkt. 56 (*Ex Parte*). This motion was denied on November 20, 2019. Case No. 2:19-cv-414 (S.D. Ind.), Dkt. 75 (*Ex Parte*).

18.  On October 25, 2019, counsel on behalf of Mr. Purkey filed an action in this Court challenging violations of the APA and constitutional law with respect to the July 25, 2019 adoption a new lethal injection protocol in 2019, and seeking injunctive and declaratory relief.

6

Case 1:19-cv-03570 Document 1 Filed 11/26/19 Page 7 of 58

*Purkey v. Barr*, Case No. 19-cv-3214-TSC (filed Oct. 25, 2019). That suit was consolidated with similar challenges, and on November 20, 2019, the Court issued an order granting injunctive relief to stay Plaintiffs' executions. *See In the Matter of the Federal Bureau of Prisons' Execution Protocol Cases*, Case No. 19-mc-145 (TSC), Order (Nov. 20, 2019).

19. Also in October 2019, counsel submitted a request under the Freedom of Information Act (FOIA) to the BOP for Mr. Purkey's updated BOP medical records, along with a request for expediting processing. Ex. 17 at 1456. In a letter from the BOP dated October 10, 2019, counsel was notified that their request for expedited processing was granted and would be processed as soon as practicable, but that processing the request may take up to six months. Ex. 16 at 1454. All of counsels' efforts to obtain these documents more expeditiously have been unsuccessful, despite the fact that Mr. Purkey's execution date is less than one month away.

## VI. STATEMENT OF FACTS

20. Wesley Purkey lacks a rational understanding of the purpose of his execution and cannot communicate rationally with counsel. As detailed below, the reason Mr. Purkey cannot rationally understand why he will be executed is multi-causal. He has long suffered debilitating symptoms from mental illness but also endured repeated instances of severe trauma since he was a child, including his father beating his mother in front of him, his father beating and abusing him, and his mother, among others, beating and sexually molesting him. He began receiving psychiatric treatment as a child too, and then essentially grew up in the prison environment, where his delusions and breaks with reality have been repeatedly documented. His damaged and diseased brain has created a delusional and paranoid world where prison staff poison him, prosecutors and courts respond in retaliation to his complaints, and the very attorneys charged with saving his life are part of the conspiracies against him. The records and expert reports

7

Case 2:19-cv-00517-JMS-DbP Document 81-1 Filed 07/14/20 Page 9 of 59 PageID
Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 8 of 58
#: 607

detailed below document this in detail. Atop all that, now 67 years of age, Mr. Purkey's dementia

and accompanying memory failures have only further diminished his capacity to understand the

basis for his execution.

> **A.    Mr. Purkey does not understand that his execution is punishment for his capital crime.**
>
> **Dr. Bhushan Agharkar, a forensic psychiatrist, concluded that Mr. Purkey is presently incompetent to be executed.**

21.    Dr. Bhushan Agharkar has concluded that Mr. Purkey is mentally incompetent to

be executed due to the combined impact of his longstanding mental illness, complex PTSD, brain

injury and dementia manifesting, as relevant here, in an unshakable delusional belief system in

which the government seeks to retaliate against him for his legal work. Ex. 1. Dr. Agharkar

based his conclusion on in-person evaluations from 2016 and November 2019, as well as a prior

evaluation in 2016, allowing him to see progressive deterioration, and an in-depth review of the

medical files, reports, and social history information. During his recent interview with Mr.

Purkey, Mr. Purkey's "psychotic thought process was evident" and he "voiced his belief that he

is going to be executed in retaliation for his legal work." Ex. 1 at 7.

22.    Dr. Agharkar first evaluated Mr. Purkey in September 2016.  Dr. Agharkar

concluded Mr. Purkey's history was consistent with the lifelong complex PTSD diagnosis that

had been made by Dr. Frederic Sautter that same year. Dr. Agharkar also concluded that it

should be anticipated that Mr. Purkey would be "hard to work with" because of his complex

PTSD. At that time, although assisting counsel with information that could be relevant to

mitigation in this capital case, Dr. Agharkar was not asked to assess or express an opinion on Mr.

Purkey's competency to be executed or other potential psychiatric diagnoses. Ex. 1 at 2-3.

Case 2:19-cv-00517-JMS-DLP Document 81-1 Filed 07/14/20 Page 10 of 59 PageID
Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 9 of 58
#: 608

23.     In his evaluation earlier this month, Dr. Agharkar observed a significant deterioration in Mr. Purkey's physical appearance and demeanor since 2016. For example, "the right side of his face is no longer symmetrical with the left side, and only the left side of Mr. Purkey's face moves when he smiles, as if he had suffered a stroke at some point." Ex. 1 at 10. Mr. Purkey began stuttering and slurring his words immediately at the onset of the interview, and he had trouble pronouncing simple words—problems which were nonexistent during Dr. Agharkar's last evaluation of Mr. Purkey. Moreover, Mr. Purkey's affect was "noticeably flatter" than it was in 2016—further signaling brain deterioration. Ex. 1 at 10.

24.     In addition to his interviews, Dr. Agharkar reviewed records documenting the lifelong trauma Mr. Purkey had endured, including physical, sexual, and emotional abuse.  The records documented Mr. Purkey's multiple suicide attempts, longstanding significant psychiatric symptoms and a number of severe mental illness diagnoses, including Schizophrenia Reaction, Schizo-Affective Type, Depression, Psychosis, and Bi-Polar Disorder, and complex PTSD. Ex. 1 at 3-7. Mr. Purkey's records further reveal a long history of severe head injuries; several times he lost consciousness resulting from automobile collisions. *Id*. at 4-5. Brain imaging in 2003 revealed temporal lobe abnormalities, while neurological testing in 2003 and 2016 showed further evidence of brain damage, particularly frontal lobe damage.

25.     As Dr. Agharkar has explained, Mr. Purkey's brain damage limits his capacity to regulate his thoughts, emotion, and behavior, which has deteriorated significantly over time. Dr.

9

Agharkar ordered additional brain imaging in September 2019 to further assess his current frontal lobe and executive function deficits. Ex. 1 at 8-9.[1]

26.     Dr. Agharkar has taken into account 2017 records indicating Mr. Purkey's diagnosis with the beginning stages of dementia, likely Alzheimer's disease. An update in 2018 indicated that observed patterns of change in Mr. Purkey since 2017 were consistent with a progression of a cortical dementia, for which Mr. Purkey was not receiving the requisite care. Ex. 1 at 9. Mr. Purkey's age, family history of neurogenerative disease and head injuries are three of the most important risk factors for dementia. Ex. 1 at 9. Dr. Agharkar concluded that Mr. Purkey's "underlying brain damage and mental illness he has are long-standing, irreversible, and will continue to deteriorate as his dementia progresses." *Id*. at 13.

27.     As Dr. Agharkar noted, Mr. Purkey also has a history of delusional beliefs and paranoid thinking, consisting not only of longstanding fixated delusional beliefs about extensive poisoning conspiracies, but also "a delusional belief system that the guards and prison are engaged in systemic retaliation against him for his legal work." Ex. 1 at 7-9. With respect to the latter, Dr. Agharkar notes that "Mr. Purkey has been a prolific filer of legal grievances and pro se lawsuits" demonstrating "the breadth and depth of his fixed belief that a host of actions . . . were carried out against Mr. Purkey in 'retaliation' for his legal work on behalf of himself and other prisoners." *Id*. at 9. His grievances in particular are "repetitive and tangential, often lacking coherence and at times in direct contravention of each other." *Id*. Several of them describe cursing or incidents by guards or other individuals that did not occur. *Id*. at 10.

---

[1] On November 20, 2019, an *ex parte* motion requesting a court order for brain imaging as recommended by Dr. Agharkar was denied, in part because it was not raised in conjunction with a pending *Ford* claim. Case No. 2:10-cv-414 (S.D. Ind), Dkt. 75 (*Ex Parte*).

10

28.     Dr. Agharkar concluded that Mr. Purkey's initial statement that he was going to be executed because of his capital crime was an attempt to "fake good" and mask the symptoms of his mental illness and cognitive decline. Ex.1 at 11. Mr. Purkey's attempts to hide or deny his mental illness, Dr. Agharkar found, were consistent with the history documented in his medical records of "minimi[zing] his psychiatric symptoms, including in evaluations in 1976, in 1981 and in 1998. Anosognosia, or lack of insight into the illness, is a key feature of schizophrenia, as are paranoid delusions. Both work together to prevent a Schizophrenic patient from revealing their illness. In short, Mr. Purkey denies that he is mentally ill because he truly believes that he is not based on the veracity of his delusions." *Id*. at 12.

29.     As part of his current effort to fake normalcy, Mr. Purkey adamantly insisted that he did not need help with his case, that, despite reams of records dating back decades, he has no mental health problems, and that Dr. Agharkar did not need to be involved. But the longer Mr. Purkey spoke with Dr. Agharkar, the more he revealed about what he believed to be the "real reason" for his execution— that he is filing lawsuits for other people's cases. Ex. 1 at 11. According to Mr. Purkey, he is the only reason other prisoners are getting claims filed, and "the guards have told him that they know his legal filings are the reason for his execution, something they tell him all the time." *Id*. Dr. Agharkar found that Mr. Purkey "sincerely believes these conversations with the correctional officers have occurred." *Id*. This belief, based in Mr. Purkey's delusional world and far from reality, drives his understanding of his scheduled execution and is not amenable to change even based on superior evidence to the contrary.

30.     But the problem goes beyond Mr. Purkey's delusional belief system. His current thought process is simply not rational. Throughout Dr. Agharkar's evaluation, Mr. Purkey "perseverated, rambled, and displayed tangential thoughts." *Id*. He "wanted to talk only about

11

what he sees as the important issues: the retaliation for his legal work, the government's eagerness to be rid of him and his successful litigation, the unfair selection of his case, and the fact that the guards can corroborate these wrongful bases for his execution." *Id*.

31. Furthermore, the memory loss caused by his dementia has only exacerbated his paranoia and cemented his delusional belief system. *Id*. As Dr. Agharkar explained, as Mr. Purkey's "brain deteriorates, the problems of paranoia worsen and become a self-reinforcing cycle. The paranoia makes it hard for him to deliberate and weigh new information. He does not trust anyone, and that distrust is heightened by his memory failings and complex PTSD. He lacks the ability to know who is trying to hurt and who is trying to help him.*" Id*. at 12.

32. Dr. Agharkar concluded to a reasonable degree of medical certainty that Mr. Purkey "lacked a rational understanding of the basis for his execution." Ex. 1 *Id*. at 11 -12. While Mr. Purkey could recite the government's position that his execution is for the murder of Jennifer Long, this recitation is merely "parroting," as he can repeat what others say but he cannot rationally understand what it means. Mr. Purkey holds a "a fixed belief that he is going to be executed in retaliation for his legal work, to prevent him from being a hassle for the government." *Id*. This belief does not stand on its own but rather serves as a foundation for an entire delusional system involving conspiracies of retaliation. This system makes it impossible for him to have "a rational understanding of the purpose of his execution." *Id*. at 12.

**Mr. Purkey believes the United States plans to put him to death in retaliation for filing successful grievances and lawsuits challenging unconstitutional death row conditions.**

33.     Mr. Purkey holds an honest and deeply entrenched belief that the federal government plans to execute him not as punishment for the murder of Jennifer Long, but because of his "protracted jailhouse lawyering." Ex. 15 at 994. In Mr. Purkey's mind, the voluminous grievances and lawsuits he has filed throughout his incarceration "have had a monumental impact in preventing correctional officers from depriving prisoners of their constitutional rights." Ex. 5 at 41. Mr. Purkey believes that Attorney General Barr and the BOP, therefore, developed a plot to kill him both as retaliation against him for his previous litigation and to prevent him from future filings. *See, e.g.*, Ex. 1 at 11 (finding that Mr. Purkey insists the government is "eager[] to be rid of him and his successful litigation"). Moreover, Mr. Purkey perceives his own counsel "as part of the conspiracy against him and his efforts to litigate against the prison" – a belief that prevents him from cooperating with them on matters related to his execution. Ex. 5 at 54.[2] According to his mitigation specialist Dr. Elizabeth Vartkessian, "Wes continues to hold onto the

---

[2] Counsel understand that petitioner's communications are otherwise privileged. Nevertheless, Mr. Purkey's mental illness and social isolation inevitably make counsel the primary witness of his incompetence. The ABA Guidelines both envision and endorse the dual role occupied by present counsel under these circumstances. *See American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, §* 10.15.1 ("Duties of Post-Conviction Counsel"), comm. (2003) ("Counsel's ongoing monitoring of the client's status … also has a strictly legal purpose. . . .[A] worsening in the client's mental condition may directly  affect the legal posture of the case[,] and the lawyer needs to be aware of developments. For example, the case establishing the proposition that insane persons cannot be executed was heavily based on notes on the client's mental status that counsel had kept over a period of months"); *Ford,* 477 U.S. at 402 (relying on counsel's notes and observations); *Panetti,* 551 U.S. at 936 (noting stand-by counsel's observations of Panetti "both in private and in front of the jury").

false belief that [his counsel] Rebecca and Michelle do not want to file certain claims related to conditions of confinement because they actually want him to die." *Id*.

34. Mr. Purkey has consistently maintained this delusional understanding of his execution since he was provided with an execution warrant on July 25, 2019. Directly after the warden informed Mr. Purkey he would be put to death on December 13, 2019, Mr. Purkey voiced his belief that the DOJ had scheduled his execution because "I really am not one of their favorite camper's [sic] here." Ex. 15 at 996. Since then, Mr. Purkey has expressed numerous delusions as well as visual and auditory hallucinations involving several Terre Haute Special Confinement Unit (SCU) staff members explicitly confirming that his execution "is based on [his] zealous filings of administrative remedies and filing so much different litigation in the courts." *Id*. at 997. *See also e.g.*, *id*. at 998 (August 23, 2019 delusion that SCU staff told Mr. Purkey, "all you do is cry and file f--- grievance and law suits [sic] on everyone here. Everyone knows why you were one of the first five to get selected to make you maker [sic] and everyone cannot wait until that happens"); *Id*. (August 31, 2019 delusion that SCU staff stated that Mr. Purkey "is the biggest piece of shit on the Unit and I cannot wait for his [sic] to take that needle for all the b.s. he has caused us with his b.s. filings on us for anything and everything"); Ex. 15 at 999 (September 15, 2019 delusion that a C.O. stated, "thank god for Barr . . . All [Mr. Purkey] does is cause problems, File on this and file on that"). 2019 Unfiled Draft Civil Rights Complaint (delusion that SCU staff told Mr. Purkey, "that is the reason Barr choose youa s [sic] one of the first to be executed because of all the problems you cause through filing on us. Everyone is tired of that b.s. you continue to file against us – now you are about to die for it").

35. Mr. Purkey's misconception of the impact of his grievances and lawsuits has further distorted his understanding of his execution. *See* Ex. 1 at 12 ("Mr. Purkey not only sees

14

Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 15 of 58

retaliation where it doesn't exist in his paranoia, but he also has a false understanding of the success of his legal work"). On multiple occasions, he has boasted about prison condition cases he believed he successfully litigated pro se-- yet these cases were actually dismissed as frivolous. For example, Mr. Purkey complained that USP Terre Haute employees terminated his employment at the law library solely because they discovered his success in *Purkey v. Green I* and *Green II*, where Mr. Purkey alleged that the Wyandotte County jail staff moved him to "segregation and incited other inmates to harm him in retaliation for his attempts to file grievances and lawsuits against jail employees." Ex. 5 at 51. In reality, however, Mr. Purkey's claims were dismissed on summary judgment for failure to state a claim. *Id.; Purkey v. Green*, No. 01-3134-JAR, 2005 WL 627959 (D. Kan. Feb. 24, 2005), *aff'd*, 164 F. App'x 792 (10th Cir. 2006). *See also e.g., Purkey v. Marberry*, 385 F. App'x 575, 577 (7th Cir. 2010) (affirming the district court's ruling granting summary judgment to dismiss Mr. Purkey's claim that the prison staff withheld legal materials from him in retaliation for filing an administrative complaint against them).

36.     As a result of his excessive frivolous pro se litigation, the District Court for the Southern District of Indiana has barred Mr. Purkey from litigating civil actions pro se unless he pays the filing fees in spite of his indigence. *See* Ex. 15 at 1106-07 (March 12, 2009 Order denying Mr. Purkey's motion to proceed in forma pauperis to litigate, in part, a claim alleging "he has been retaliated against for seeking redress through administrative grievance procedures" because he had filed at least three suits or appeals that were "frivolous, malicious, or fail to state a claim"). Though Mr. Purkey cannot afford the filing fees, he continued to file civil actions derived from his delusions, which were ultimately dismissed for his failure to pay. *See, e.g.*, Ex.

15

15 at 1040-41 (October 9, 2015 Order dismissing *Purkey v. Daniels* 2:15-cv-00310 for failure to pay the required filing fee).

37.    Despite all the evidence to the contrary, Mr. Purkey is convinced that he is the only person capable of bringing the systematic abuses of prison officials to light, and that he is scheduled to die because of his whistle blowing filings. Ex. 5 at 42 ("He views himself as the only one able to effect change for the other inmates. Likewise he has stated that the other inmates are not strong enough to handle the retaliation he experiences in order to safeguard the protections inmates are supposed to be afforded"). *See also* Ex. 1 at 11. Mr. Purkey asserted, "I've helped so many people here.  The lawyers suck.  No one advocates for the inmates, they need me"). Mr. Purkey has been driven by this delusion for decades, as evident by a grievance from 2007:

> It is the same behind all penitentiary walls, those who hold the power can make them' [sic] up as they go and to hell with those who lay totally vulnerable to such abusive power. All cesspools are predicated with these cesspool values, and as you told me, if I did not like it file on it. Integrity does not come without a high cost, and my word is as good as it gets and file I will. . . I will continue to exercise those constitutional rights no matter the fires they build under the feet of those that redress is sought of.

Ex. 14 at 974 (January 23, 2007, grievance).

**B.    Wes Purkey has a long and documented history of mental illness with delusional and paranoid thinking.**

38.    Mr. Purkey's present incompetence is rooted in a history of mental illness, trauma, and paranoid delusional thinking, as evidenced by lay witness accounts, institutional records, and expert analysis spanning decades. As a whole, this evidence establishes that Mr. Purkey suffers from severe mental illness and cognitive impairment, which, combined with dementia and a lifetime of trauma and deprivation, render him incompetent to be executed.

16

**From childhood, Wes Purkey has exhibited signs and symptoms of serious mental illness, cognitive deficiencies, and PTSD.**

39.     Mr. Purkey's mental deficiencies and impairments have been evidenced since his childhood. As a child, he did not speak until he was six-years old, a serious delay. Ex. 1 at 5; Ex. 26 at 1510. His aunt, Marguerite Hotchkiss, described how he could only "point and grunt" before age six.  Ex. 26 at 1510. When he did begin to speak, he spoke with a stutter. *Id*.

40.     Mr. Purkey began to receive serious psychiatric treatment as early as age 14, when he was admitted to the Wichita Psychiatric Center because of severe headaches, vomiting, fatigue, and blackouts.  Ex. 13 at 125. At that time, Mr. Purkey was in the care of his maternal great-aunt, Carrie Burke, because his mother had abandoned him. *Id*. Hospital records note that his father walked out on his mother and that his mother had a history of drinking, temper fits, and promiscuity that she "carried on rather openly in front of the boys." *Id*.  Mr. Purkey had been referred for psychiatric evaluation and treatment from his medical doctors.  *Id*.  The attending physician ordered hospitalization and an EEG to evaluate a "poss. tumor" or "poss. temporal lobe syndrome."  *Id*.  The hospital administered two EEGs, one of which was normal, but the other showed "slowing of activity" in the "left frontal, anterior temporal and temporal regions." *Id*. at 132-33. Mr. Purkey was prescribed Librium, a drug prescribed for anxiety or tremors, and Thorazine, an antipsychotic. *Id.* at 136, 139.

41.     The hospital's assessment of Mr. Purkey's home life before he went to live with his great-aunt, while accurate, was incomplete. It omitted the serious physical violence Mr. Purkey's father inflicted on both him and his mother in Mr. Purkey's presence. The report further omitted Mr. Purkey's sexual molestation and rape by his mother, by a priest at church, and by a friend of Mr. Purkey's older brother. The report also failed to capture the profound isolation Mr. Purkey experienced as a child. Ex. 10 at 94-100.

Case 2:19-cv-00517-JMS-DLP Document 81-1 Filed 07/14/20 Page 19 of 59 PageID
Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 18 of 58
#: 617

42.     Mr. Purkey's father, Jack Purkey, was an alcoholic and a "mean drunk." Jack Purkey terrorized Mr. Purkey's mother, Velma, in front of their children, beating her several times a week. Jack once punched a hole in the wall when Velma had ducked and missed the blow intended for her. He broke Velma's arm by repeatedly slamming it in a door. Ex. 13 at 796. On another occasion Jack dragged Velma down the hallway by her hair in front of Mr. Purkey while his mother screamed for help. Ex. 10 at 98; Ex. 13 at 799. Mr. Purkey feared for his mother's safety, and when he tried to intervene on her behalf, his father focused his rage on him. Ex. 13 at 799.

43.     Jack terrorized Mr. Purkey on a regular basis, beginning at age five. He beat Mr. Purkey with his fists and other items—often a belt—until he was bleeding and bruised. Ex. 10 at 98; Ex. 13 at 569. When Mr. Purkey was six years old, Jack beat him and drove his head through a wall. Ex. 10 at 104. Jack also punished Mr. Purkey for his stuttering. At thanksgiving one year, his father threw a bowl full of jelly at him for stuttering. Ex. 10 at 97; Ex. 13 at 495; Ex. 18 at 1464; Ex. 19 at 1475. Though Mr. Purkey's parents divorced when he was nine years old, his father's abuse did not end. Mr. Purkey's father continued to beat him until he was 12 years old. Jack also forced Mr. Purkey to have sex with prostitutes. Ex. 10 at 98-99.

44.     Velma, Mr. Purkey's mother, was an alcoholic who also emotionally terrorized and sexually preyed upon Mr. Purkey. Ex. 13 at 252, 316; Exh. 1652. Velma, like Jack, ridiculed and punished Mr. Purkey as a young child for his stuttering. She threw drinks in his face when he stuttered. Ex. 18 at 1464; Ex. 19 at 1475.

45.     Around the time of her divorce, Velma began molesting Mr. Purkey, a pattern of rape and sodomization that continued for 13 years until Mr. Purkey was 22 years old. Ex. 13 at 803; Ex. 13 at 799-800; Ex. 13 at 801; Ex. 13 at 585; Ex. 27 at 1512; Ex. 20 at 1481. Velma

18

Case 2:19-cv-00517-JMS-DLP Document 81-1 Filed 07/14/20 Page 20 of 59 PageID
Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 19 of 58
#: 618

made Mr. Purkey sleep with her as a boy, and she molested him by touching his genitals. She forced him to penetrate her with a hairbrush, to perform oral sex on her, and to have sexual intercourse with her. Ex. 10 at 99.

46. As a child, Mr. Purkey lived in constant fear for his own safety. He felt alone and abandoned. Ex. 10 at 9-10; Ex. 23 at 1496; Ex. 25 at 1509. As he grew older, he withdrew from most of his childhood friends. Ex. 22 at 1493. And school was no refuge. He attended a Catholic school where he was brutally punished and humiliated for his stuttering. Ex. 22 at 1493; Ex. 24 at 1502-03. His shame, anxiety and distress only grew through his school years. Ex. 10 at 97, 100.

47. Mr. Purkey was also sexually abused at church, where a parish priest molested him over a three-year period, from the ages of eleven to thirteen. Ex. 10 at 99; Ex. 21 at 1488. This abuse had a profound impact on Mr. Purkey, heightening his senses of isolation and fear. *Id.* The fact that home, school, and his faith community were independent sources of abuse and trauma left him with no place to turn. He began to follow his older brother, Gary, and his friends, a path that led to Mr. Purkey introduction to alcohol at the age of eleven or twelve. Ex. 13 at 796; Ex. 24 at 1503-04. One of Gary's friends soon joined the all-too-long list of Mr. Purkey's sexual abusers. Ex. 10 at 99.

48. In 1967, when Mr. Purkey was 15, he was seen at St. Francis Hospital for an evaluation of psychiatric treatment needs. Ex. 13 at 149-63. He was prescribed Librium again, as well as Placidyl, a sedative. *Id.* at 157-63. The following year, when he was 16 years old, Mr. Purkey was admitted for hospital stays on three occasions. The first, in March, was for an acute cerebral concussion following a car accident. Ex. 13 at 164. He lost consciousness, and did not remember the accident or the period after the accident. Ex. 13 at 166-67. He went to the hospital

19

Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 20 of 38

following a second car accident just two months later, with contusions to his face and abrasions to his forehead. Ex. 13 at 171-72. His third admission that year, in November of 1968, followed fighting, drinking and notable changes in his behavior. He was "disheveled and dirty- shaking and nervous," when admitted and he was again prescribed Thorazine, the antipsychotic. Ex. 13 at 173-85.

49.     By this time, Mr. Purkey was heavily using alcohol and drugs. Ex. 13 at 164. As a teen, he regularly drank quarts of whiskey, large quantities of beer and huffed intoxicants. Ex. 20 at 1479-80; Ex. 13 at 195, 202; Ex. 13 at 256; Ex. 13 at 299-300. He first used heroin and acid as a teenager. Ex. 28 at 1498.

**As an adult, Mr. Purkey has continued to exhibit paranoia, behavioral symptoms, and delusions.**

50.     From 1970 onward, the majority of Mr. Purkey's life has been spent incarcerated. During the 1970s, he spent several months in the notorious solitary confinements of the "A & T" (Adjustment and Treatment) building at the Lansing State Penitentiary in Lansing, Kansas.  Ex. 38 at 1628-39; Ex. 25 at 1508-09. Commonly known as the "Agony and Torture" unit, it was widely condemned by experts, activists, and lay persons alike for the corrosive effects it had on mental health, a "concrete tomb" of sensory deprivation, with horrific conditions. Ex. 25 at 1508. Mr. Purkey, like many others housed in A & T, engaged in self-mutilation during his detention there.  Ex. 32 at 1522.

51.     In 1971, Mr. Purkey underwent a more extensive psychiatric examination at the Kansas State Reception and Diagnostic Center, following a burglary conviction. Ex. 13 at 191. Dr. Targownik noted that Mr. Purkey had been sent to Wichita Psychiatric Center for behavior issues, headaches, and dizziness. *Id*. at 191-92. He found that Mr. Purkey presented with "a somewhat 'wild, bizarre' expression on his face" and noted he was "mildly depressed" but

"portray[ed] a feeling of being slightly hyperactive." *Id.* at 192. Though Mr. Purkey denied any delusions during Dr. Targownik's evaluation, he noted "one gets the feeling that, while talking to him, there may be some things going on that he is not talking about." *Id.*

52.     Dr. Targownik diagnosed Mr. Purkey in 1972 with "Schizophrenia Reaction Schizo-effective type, depressed." Ex. 13 at 193. He noted Mr. Purkey's "weird and unpredictable behavior" that is "often very impulsive," *id.* at 192, and concluded, there is "no doubt that [Mr. Purkey] is seriously emotionally ill and further, no doubt, that he needs treatment." *Id.* at 193. He lamented that Mr. Purkey had not been able "in the eighth grade to receive the help that was recommended by the Wichita Psychiatric Center," namely placement with "institutional care and treatment." *Id.* He recommended that Mr. Purkey be committed to Larned State Hospital. *Id.*

53.     Mr. Purkey would not be admitted to Larned State Hospital until the end of 1972, when he was 20 years old. In the interim, he suffered yet another vehicle-related cerebral concussion with lacerations to his face and forehead. Ex. 13 at 206. The police officer reported that Mr. Purkey had been "unconscious for several minutes" following the injury. *Id.* at 207. The attending physician noted that Mr. Purkey had "a severe emotional unstable background, both genetic and environmental," and referred Mr. Purkey for a psychogenic consult to try to "help him." *Id.* at 209. He left the hospital without completing the psychological evaluation even though the attending noted that he "needs psychiatric treatment much and has needed it for some time." *Id.* at 210.

54.     Mr. Purkey was admitted to Larned State Hospital in December of 1972, shortly before his 21st birthday. Ex. 13 at 194. The inpatient evaluation again stressed his chaotic childhood, reported the prior diagnosis of schizophrenia and noted that Mr. Purkey appeared

21

"somewhat depressed." *Id*. at 203. He was prescribed Sinequan and Thorazine and remained in the hospital from December 29, 1972, through April 13, 1973. *Id*. at 205.

55.     Outside of prison, Mr. Purkey continued to exhibit bizarre symptoms, delusions, hallucinations, and paranoia. He attempted suicide on multiple occasions and accelerated his heavy drug use. Shortly after his release from the Kansas prison for the burglary charge, he met Claire Gaida, who would become his common law wife. In 1976, Claire took him to the emergency room, where he was once again admitted, this time for an overdose. He admitted taking Tylenol, and Tranxene, an alcohol withdrawal drug, with alcohol. He was completely incoherent for the first 18 hours and hallucinating. The nurse notes show that several hours after his admission he was looking for items that did not exist, and that he believed there were "fifteen mice" on the ceiling. Hours later, he was still hallucinating. Despite this, he was discharged without additional follow up. Ex. 13 at 256-64.

56.     In May of the same year, Mr. Purkey was admitted yet again for another head injury—a probable "green-stick type of facture" to his cheekbone. Ex. 13 at 293-97. In September of 1976, Mr. Purkey was arrested for burglary and robbery and once again sent to the Kansas State Reception and Diagnostic Center for evaluation. Ex. 13 at 298. The evaluator concluded that Mr. Purkey showed distrust of others and made "efforts to conceal" his inner anxiety. Ex. 13 at 300.  He reported auditory and visual hallucinations with drug use. Ex. 13 at 299.

57.     Between 1977 and 1980, while at the Kansas State Industrial Reformatory, Mr. Purkey attempted suicide on two occasions, cutting his wrists for the purpose of "harming or killing himself." Ex. 13 at 636. While there, he was observed to be "anxious, depressed, frustrated and unable to sleep" as well as emotionally distant. *Id.* The psychiatrist observed

auditory hallucinations, noting that Mr. Purkey "whispered in an entirely different conversation from what he [was] talking aloud." *Id*. The psychiatrist prescribed Sinequan, a psychotherapeutic drug, for treatment. *Id*.

58.     Mr. Purkey was released on parole briefly in 1980. Ex. 13 at 328. Though he had planned to enroll in drug counseling as ordered by his parole officer, his great-aunt, Ms. Burke, who had raised him after his mother's abandonment, died at the same time as his release. Ex. 13 at 569.  Instead of rehab, Mr. Purkey returned to heavy drug use, and was rearrested within 3 weeks of his release. Ex. 13 at 328.

59.     After his arrest, Mr. Purkey remained in custody from 1980 until 1997. During this period, Mr. Purkey's delusion of poisoning presented for the first time. On July 15, 1988, the Watch Commander requested medical assistance because Mr. Purkey was "engaging in bizarre behavior." Ex. 13 at 722. He "said other inmates were spraying him with poison spray," and he began to throw "water into the shower on the tier in front of the cell; reportedly to keep poison out so [he] could breath." *Id*. Mr. Purkey believed other prisoners were "spraying [him] with chemicals" on at least two other occasions during this stretch of incarceration. Ex. 13 at 604.

60.     While out of custody, Mr. Purkey's second wife, Jeanette, took him to Via Christi Regional Medical Center, where he was admitted and diagnosed with Psychosis. Ex. 13 at 336. While there, the doctors observed visual and somatic (touch) hallucinations as well as paranoid delusions. The history notes describe his presentation:

> This 45-year-old, white American male was reportedly doing fine up to four or five days ago when he started to act paranoid and told his wife that somebody was trying to poison him. He also woke up his wife, saying while he **was asleep he was sprayed with a poisonous mist** several times, and his blood has poison in it. This kind of paranoid behavior has been going on for the past four days. He also told his **wife that his house is wired and they can see his wife and children and himself all the time.** Last night, the wife had called the police three times because of his paranoid behavior. The patient has

23

been acting strange according to wife, extremely anxious and suspicious of everybody and restless.

Ex. 13 at 345. The mental status evaluation showed that he was "anxious, agitated, pacing up and down in the emergency room, difficult to curtail," and that he reported that there were "people waiting out in the lounge who are planning to have him murdered." *Id*. He stood up during the interview to leave the room because "they" were "spraying me with their mist." Ex. 13 at 346. He later described "people on the roof last night spraying a chemical in his room," and said the "chemical was activated by a beam." Ex. 13 at 343. He was prescribed Haldol, an anti-psychotic drug, and Ativan, a benzodiazepine drug, for his symptoms. *Id*. at 353.

61.     Mr. Purkey's ex-wife, Claire Gaida, later described how, around this time period, he "called the KBI [Kansas Bureau of Investigation] on himself saying drug dealers were trying to kill him and chemicals were coming through the vents and ceiling and had planted something in his chest and were suing remote things to increase it." Ex. 13 at 552. She said he was "way flipped out," and although that is the way "he gets on them drugs. . . . he stays the same when he doesn't have nothing in his system." *Id*. In August or September of 1998, Mr. Purkey and his wife moved out of their trailer home. Mr. Purkey had "torn out the insulation from under the trailer home, because [he] thought that there were cameras installed in the insulation." Ex. 31 at 1521.

62.     Later in September of 1998, Mr. Purkey was admitted to University of Kansas Hospital for a "bright light," pain around his head and abdomen, and chest pains. Though he later described this admission as for a drug-induced heart attack, Ex. 13 at 562, in fact, his toxicology screen was negative for narcotics, with the exception of nicotine, and his EEG was normal. Ex. 13 at 431-32.

24

63.     Just one month later, Mr. Purkey was charged with the October 28, 1998, murder of Mary Ruth Bales. In 1999, he was transferred to Larned State Mental Hospital for a competency and sanity evaluation. Ex. 13 at 487. The State evaluators concluded that Mr. Purkey was competent to stand trial, but found he met the criteria for an Axis 1 serious mental illness diagnosis, Depressive Disorder, as well as Antisocial Personality Disorder. *Id.* at 489.

64.     Mr. Purkey was in custody for the Bales murder in Kansas City, Kansas between 2000 and 2002. During this time, he again complained of poisoning, this time by correctional officers. Ex. 13 at 622-23, 723. During an episode in August 2000, Mr. Purkey stated that he believed his "heart [was] going to pound out of his chest" and "reported headache, stomach cramps, and 'every time I close my eyes I feel like I'm trippin.'" Ex. 13 at 723. Because of these symptoms, medical providers conducted tests for "amphetamines, barbiturate, benzoziazepine, cannabinoid, cocaine metabolite, phencyclinide, methadone, and propoxyphene," all of which were negative. *Id.*  Following his episode in 2001, Mr. Purkey was diagnosed with psychosis and prescribed the anti-psychotic drug Haldol and an antidepressant. Ex. 13 at 622.

65.     During this period, Mr. Purkey on his own, without discussing with his counsel, contacted the FBI and confessed to the murder of Jennifer Long, a murder for which he was indicted on October 10, 2001.  He was motivated in part by the failure of any of his lawyers to take seriously his serial poisoning allegations. Ex. 30 at 1519-20. In 2002, he was sent to a Federal Medical Center for evaluation and was diagnosed with Bipolar Disorder. Ex. 28 at 1517; Ex. 29 at 1518. He was prescribed Klonopin, Depakote, Buspar, and Tegretol/Carbamazepine, anti-anxiety and anti-seizure medications, often used to treat Bipolar disorder and seizures. Ex. 36 at 1534-1626. The District Court for the Western District of Missouri ordered a competency evaluation, and the Director of Forensics at the Federal Medical Center described the period

Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 26 of 58
#: 625

between December 2000 and January 2001, throughout which Mr. Purkey complained of other prisoners spraying chemicals in his cell, as a period of psychosis that was not drug induced. *United States v. Purkey*, Case No. 4:01-cr-00308-FJG, Dkt. 219; Ex. 13 at 622.

66.     By this time in his life, Mr. Purkey had undergone a number of clinical evaluations, yet none of the evaluators measured Mr. Purkey's exposure to trauma. Ex. 11 at 110. Thus, none had considered whether Mr. Purkey's symptoms and trauma history—taken together—established a PTSD diagnosis. This was true even for the three evaluators who administered testing with interpretable PTSD data. *Id.* In 2016, Dr. Sautter, a clinical psychologist with extensive background in post-traumatic stress disorder, conducted a clinical interview and administered formal testing to evaluate Mr. Purkey's mental health factors relevant for his capital sentencing. Ex. 10 at 90-107. He found that Mr. Purkey put forth good effort in all of the testing. When Dr. Sautter analyzed and reported this available historical data, he found that Mr. Purkey's scores were consistent with a PTSD diagnosis each of the three times he had been tested, including the MMPI-2 testing by the Kansas Department of Corrections. Ex. 11 at 111.

67.     Based on an extensive interview and social history review of documents, Dr. Sautter found that Mr. Purkey had been exposed to several adversities that increased his risk of posttraumatic stress, lack of any treatment for depression or trauma, deprivation of medical and mental health care, and lack of emotional support. Ex. 10 at 96-97. Dr. Sautter also found that Mr. Purkey was exposed to an overwhelming number of traumatic stress events, including physical, sexual and emotional childhood abuse and neglect. *Id*. at 97-98.   The extensive medical records, social history, and testing of Mr. Purkey all showed with remarkable consistency that Mr. Purkey developed the syndrome of complex PTSD. *Id*. at 106.

68.     After his conviction for the Long murder, Mr. Purkey's poisoning delusions became a fixation. He told his lawyers that the Drug Enforcement Administration (DEA) was involved in his poisoning in Wichita, and that a Wyandotte County lawyer was a "placebo" who kept the truth from coming out about the poisoning. Ex. 14 at 978-79.

69.     Throughout his incarceration, Mr. Purkey has also accused prison staff of tainting and poisoning his food. *See., e.g.,* Ex. 14 at 956-57 (September 10, 2009, grievance relating to "being forced 'again' to eat . . . spoiled uncooked food items."); Ex. 14 at 931 (December 2, 2009, grievance detailing "threats to taint my food for making complaint, filing grievances [sic] and lawsuits"). In September 2018, Mr. Purkey reported that he was:

> forced to eat uncooked entrée served to me by FSA Oliver. . . Almose [sic] immediately after eating I suffered, severe stomach cramping one pain burning eat vomiting not I have diarrhea [sic]. This is one of the dozen or more uncooked entrees Oliver served . . . that was caused me to become sick after consuming it.

Ex. 14 at 875 (September 30, 2018 Health Services Notes). When medical staff offered assistance, however, he denied the need for treatment and stated he merely wanted to document the incident. *Id*.

70.     Mr. Purkey's fixed and false belief that the BOP is targeting him in retaliation for his jailhouse lawyering is not new. Indeed, his delusions and paranoia are predominately featured in the countless grievances he has regularly filed for over a decade. *See* Ex. 14 at 817-38. An overwhelming majority of these grievances explicitly "seek[] redress for the campaign of retaliation" Mr. Purkey believes correctional staff have waged against him because of his highly successful jailhouse lawyering challenging death row conditions. Ex. 14 at 961-62. *See also* Ex. 14 at 968-69 (December 5, 2008, grievance alleging "retaliatory action in punishment for my complaints made to [a staff members'] superior"); Ex. 14 at 963 (January 4, 2009, grievance alleging "retaliation for me aiding therse [sic] other inmates with litigation and filing

27

grievances"); Ex. 14 at 921 (January 28, 2010, grievance alleging "retaliation for my aiding inmate Holder in preparing and filing litigation"); Ex. 14 at 910-11 (September 9, 2010, grievance alleging, "deliberate acts of retaliation" for "grievances recently filed"); Ex. 14 at 887 (February 28, 2016, grievance alleging "retaliation for seeking redress for issues of my confinement via both the administrative remedy processes, as well as via non/formal channels"); Ex. 14 at 877 (July 31, 2018, grievance alleging "retaliatory disciplinary" action "for exercising the tip of the bic seeking redress for issues of my confinement and assisting others as well").

71.     Because Mr. Purkey's mental illness and paranoia have framed the accounts in his grievances, they reflect his sincere and consistent, but distorted, perception of reality. While he genuinely believes the narratives of retaliation he provides in his grievances, rarely do his depictions align with the truth. Since his arrival at USP Terre Haute, Mr. Purkey has accused, in his grievances alone, well over fifty named Terre Haute employees and several more unnamed employees of "ongoing retaliatory calculated harassment." Ex. 14 at 822. *See also* Ex. 14 at 817-38. As his filings suggest, Mr. Purkey strongly believes that nearly everyone around him in a position of authority is either conspiring against him or covering up for someone else who is. *See e.g.,* Ex. 14 at 968-69 (December 5, 2008, grievance, alleging "collusion" and a "cover-up"); Ex. 14 at 966-67 (December 22, 2008, grievance stating "but of course as [C.O.] Ison knows that anything he does on this unit will be covered-up by his good ole boy partners…"); Ex. 14 at 945-46 (September 25, 2009, grievance detailing a "deliberate conspiracy" and "active steps to cover-up retaliation"); Ex. 14 at 901-02 (October 15, 2010, grievance "clarifying the lengths [Unit Manager] Edwards will go to in covering up his fellow workers dirty deeds"); *Id.* (October 15, 2010, grievance stating, "this attitude to cover-up SCU abusive actions against me and other death row prisoners has been thoroughly documented"); Ex. 14 at 861-68 (December 5, 2018,

28

Declaration of Wesley Purkey stating, "Staff will lie at the drop of a hat to cover each other when one or more of them is subjecting any inmate to reprisals in seeking redress for abuses that they are subjecting that inmate to"). Mr. Purkey's delusions surrounding retaliation conspiracies and related cover-ups are not confined to the employees at USP Terre Haute. His grievances filed when he was confined within the Kansas Department of Corrections also describe elaborate schemes involving "destroying grievances" documenting retaliatory misconduct by staff dating back to at least 2000. Ex. 14 at 980-81 (August 10, 2000, grievance, to which the unit team responds, "you offer absolutely no evidence supporting your allegation that UT staff are aware of AND covering up staff misconduct").

72.     As Mr. Purkey's grievances demonstrate, not only does he see nearly everyone around him as having "retaliatory animus," but he also interprets nearly everything they do as an act of retaliation. Ex. 14 at 925-926 (January 06, 2010 grievance). Some of Mr. Purkey's claims of retaliation for filing grievances and lawsuits involve staff following normal operating procedures of the prison, such as searching his cell, Ex. 14 at 949-954 (September 23, 2009 grievance); assigning him a new cell, Ex. 14 at 874 (November 4, 2018 grievance); confiscating contraband, Ex. 14 at 970-971 (December 4, 2008 grievance); performing routine nighttime bed checks, Ex. 14 at 939-940 (November 2, 2009 grievance); denying visitation requests, Ex. 14 at 872-873 (November 7, 2018 Declaration of Wesley Purkey); and placing him in more restrictive housing. Ex. 14 at 973 (February 14, 2007 grievance stating, "Perhaps you could step up and merely tell me, Purkey you are not going to phase II because you will not stop with the grievances and lawsuits – someone should at least show the character to tell it as it is…").

73.     But Mr. Purkey has also accused prison staff of retaliation when they act in ways that objectively serve his best interests. For example, after filing a grievance claiming his

29

commissary order was "retaliatorily denied," Mr. Purkey then filed a subsequent grievance alleging that the *approval* of his commissary order also constituted an act of retaliation. Ex. 14 at 949 (September 23, 2009 grievance). According to Mr. Purkey, the Warden purposefully waited to approve his order when a computer malfunction prevented all prisoners from receiving commissary specifically to cover-up the fact that she was targeting Mr. Purkey:

> This approval by Warden Marberry was no less than sham to enspand [sic] the ongoing campaign of retaliatory actions being waved [sic] against me by administrative and security personnel. . . . Warden Marberry was thoroughly aware that I would not be receiving commissary [sic] today,. . . .  but yet she flaunted this farce in retaliation for my filing grievances against the commissiary [sic] and lawsuits against her.

*Id*. As another example, just two days after accusing prison staff of "retaliatorily" refusing to put his name on the list for access to the law library, Ex. 14 at 861 (December 5, 2018 Declaration of Wesley Purkey), Mr. Purkey filed a grievance asserting that the staff retaliated against him by *adding* his name to the list. Ex. 14 at 860 (December 7, 2018 grievance).  According to Mr. Purkey, the staff's actions were designed "to give the appearance that I am refusing law library access despite never submitting a written request for such." *Id*.

74.     In addition to making him suspicious of other's motives, Mr. Purkey's paranoia and delusional thinking has made him fixated on seeking redress for specific actions that never even took place. As his grievances from the last ten years illustrate, Mr. Purkey's sincere beliefs are often completely divorced from reality. For example, according to Mr. Purkey:

> In the past year and a half or more both SCU Unit Manager Thomas and Case Worker Sutton have reiterated and clarified that because of my sedulous and assiduous filing of administrative remedies, and as well as for assisting other inmates in filing of in turn and aiding other inmates in preparing and filing litigation naming Thomas as a named defendant in such litigation that any and all visitors that I request will be denied, and they have maintained this tactic policy on different occasions denying requested visitors.

30

Case 2:19-cv-00517-JMS-DLP70 Document 81-1 Filed 07/14/20 Page 32 of 59 PageID
Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 31 of 58
#: 630

Ex. 14 at 872 (November 07, 2018 Declaration of Wesley Purkey). Yet, Mr. Purkey had many non-legal visits during the period he believed staff retaliatorily denied him all visitation. Ex. 5 at 39.

75.    Additionally, he regularly accuses staff of making statements they never said. *See, e.g.,* Ex. 14 at 883 (January 20, 2017, email from health service provider to Mr. Purkey asserting, "The things you state that I have said are untrue. I have never stated this or said anything remotely close to this"). Often, the imagined statements from staff documented in Mr. Purkey's grievances that he is convinced he heard include foul language and threats of retaliation for his legal work. *See, e.g.*, Ex. 14 at 967 (December 22, 2008, grievance alleging a correctional officer told him "you can fuck yourself and your family"); Ex. 14 at 959 (February 26, 2009, grievance alleging C.O. Isom "told me that no one gives a fuck about those god damn grievances and to stick my legal work in my ass"). Ex. 14 at 825 (August 28, 2010, grievance alleging C.O. Myers said Mr. Purkey "was nothing but a rat – constantly filing grievances . . . and telling lies through fucking grievances"); Ex. 14 at 900 (November 16, 2010 Declaration of Mr. Purkey alleging C.O.s Hoffman and Modesitte told him "no one gives a fuck around [sic] your grievances. You are just a fucking punk"); Ex. 14 at 870 (December 3, 2018, grievance alleging C.O. Johnson repeatedly told Mr. Purkey "we don't give a fuck about SCU policy"); Ex. 15 at 1000 (delusion that SCU staff stated, "just afew [sic] more weeks and that filing of grievances and lawsuits will be history and that big baby will be in the ground. . . .Die M.F.er – die"); *see also* Ex. 14 at 972 (Contrary to Mr. Purkey's accusations of officials using foul language, on February 20, 2007, the Warden wrote Mr. Purkey, "Your correspondence also contained inappropriate language. This is to inform you that I will not respond to correspondence containing inappropriate language.").

31

76.     Despite the fact that Mr. Purkey regularly claims that staff broadcast their retaliatory threats, harassment, and abuse in front of large audiences, his allegations cannot be corroborated. For example, nine days before Mr. Purkey learned the federal government would end its sixteen-year hiatus from executions and schedule him to be put to death, Mr. Purkey filed a grievance alleging that the Officer in Charge threatened him in front of several witnesses. Ex. 14 at 843. According to Mr. Purkey:

> OIC Haulon came to the upper treadmill Rm [sic] and told me 'you are a rat piece of shit for writing me up-and you try to shit me down, I'll shit you down you rat piece of shit.' . . . Haulon *walked off screaming with all other staff hearing him* as well as the orderly telling me, 'you're a rat piece of shit and I'm getting your ass sent back to phase I - he repeated this several times and then told me – *screaming* that, 'if you don't like that I'm going up and tear your cell apart – see what I can find and take.' *Everyone heard him screaming these threats out.*" . . . Haulon told [Nurse Keller] 'Everyone is tired of his b.s. writing people up . . . [s]o if you can write him for anything – do it.

*Id*. (July 16, 2019 grievance) (emphasis added). Though Mr. Purkey identified witnesses by name, including an USP Terre Haute medical provider, the prison administration could not substantiate the complaint and has not taken any disciplinary action against OIC Haulon for this alleged incident over four months ago. *See, e.g*., Ex. 14 at 945 (no disciplinary action taken against Case Worker English after Mr. Purkey claimed in a September 25, 2009, grievance that he, "*with the entire range listening* screamed at me, 'no on [sic] fucking believes a word you say, we can shake your cell down whenever we want and take whatever we want as well. Now write that up") (emphasis added). Mr. Purkey has gone to great lengths to comprehensively document what he perceives as retaliatory misconduct, habitually attaching additional pages of narrative to grievance forms in order to capture every minute detail of his delusions. *See, e.g.,* Ex. 14 at 966-67 (December 22, 2008, grievance); Ex. 14 at 947-48 (September 24, 2009); Ex. 14 at 841-42 (August 21, 2019, grievance). Yet after thorough investigations into every allegation, Mr.

32

Purkey's claims are routinely dismissed for lacking merit. *See, e.g.*, Ex. 14 at 976 (January 4, 2007 Letter from Warden stating, "All allegations are reviewed and referred to the appropriate office for investigation").

77.     Nonetheless, Mr. Purkey is convinced correctional staff are regularly threatening and physically assaulting him. *See, e.g.*, Ex. 15 at 1073. (March 15, 2012, Motion to Suspend Appellate Proceedings, claiming "Officer Newman spit in Purkey's face telling him, 'you want more of this keep filing your grievance and requesting law library'"); *id*. (claiming prison staff denied Mr. Purkey meals and told him "continue making complaints and you will not be feed at all"). As a result, he has been in constant "fear for [his] safety." Ex. 14 at 858 (December 18, 2018 grievance). *See also* Ex. 14 at 864 (December 5, 2018, Declaration of Wesley Purkey); Ex. 14 at 844 (July 16, 2019, grievance).

78.     This fear is exacerbated by Mr. Purkey's paranoia and delusional belief that correctional officers are responsible for numerous stabbings within the prison walls. According to Mr. Purkey:

> In the recent past OIC Wheeler orchestrated inmate Coone [sic] to being attacked by inmate Snar on lower C-Range. . . . Not long prior to this retaliatory incitement SCU Case Worker Edwards deliberately had inmate Roone moved to a differ-leisure group providing opportunity for another inmate to repeatedly stab Roone.

Ex. 14 at 864 (December 5, 2018 Declaration of Wesley Purkey).

79.     Indeed, the "history underscoring SCU staff culture in using inmates to extract retaliation for them against other inmates that they have deep rooted animus against" has been a reoccurring theme in Mr. Purkey's grievances. *Id*. *See also* Ex. 14 at 967 (December 22, 2008, grievance); Ex. 14 at 916-17 (August 28, 2010). As another example, Mr. Purkey incessantly accused both Case Worker Sutton and Unit Manager Thomas of plotting with other prisoners to force him to live in a cell "caked in feces." Ex.

14 at 874 (November 4, 2018, grievance). In a letter to Case Worker Sutton, Mr. Purkey wrote:

> Now it all come to light, the adolescent you and Thomas put out on the range-- acting as your surrogate in making cell moves Friday, 11/2/18 went to inmate Bourgeois-- Thomas little bubby and they schemed-up my cell move. Move Bourgeois back to 404-C which he had previously caked with feces- move me to his last cell occupied 411-C. Do little feces caking in obscure places and place me at the end of the range next to Gabrion[3] – and then move one the adolescent little click members into 419-C where I was supposed to be moved. . . . of course you were vividly aware of this scheme... So Mr. Sutton you utilized the adolescent to carry out your act of retaliation against me-good job.

*Id*. In Mr. Purkey's mind, the orderly in charge of cell assignments unapologetically advised Mr. Purkey that he was intentionally placed in a cell with feces because "you're a piece of shit." Ex. 14 at 873 (November 7, 2018, Declaration of Wesley Purkey).

80.     Even when Mr. Purkey is confronted with evidence discrediting his delusions, his erroneous beliefs are unshakeable. As an example, for a two-year period, Mr. Purkey filed an abundance of grievances reporting what he characterized as an "ongoing campaign of retaliation being taken against me by the 12[am]-8[am] shift, i.e. being waken up every twenty to thirty minutes and deprived of sleep almost every night for an inordinate period of time." Ex. 14 at 910 (September 9, 2010, grievance). *See also* Ex. 14 at 941-42 (October 27, 2009, grievance); Ex. 14 at 929 (December 30, 2009, Letter to Warden Marberry); Ex. 14 at 927 (January 3, 2010, grievance); Ex. 14 at 918 (August 3, 2010, grievance); Ex. 14 at 908-09 (September 12, 2010,

---

[3] In a letter to his counsel dated January 26, 2019, Mr. Purkey writes: "From the frying pan to the fire – after making complaints about my next door neighbor, Gabrion beating on the wall and blasting external speakers connected to his t.v. and radio all day and night – OIC Raymond refused to allow me [access to the law library and] the phone – despite submitting written request[s] per SCU policy." Ex. 14 at 852. He then accuses staff of sanctioning Gabrion's external speakers against SCU policy, specifically "for the purpose of harassing me." *Id*.

34

grievance); Ex. 45 at 1653 (October 21, 2010, grievance). In each of these grievances, Mr. Purkey described elaborate night-long harassment and death threats by various correctional officers, with C.O. Hatfield[4] as the ringleader. *See, e.g.* Ex. 14 at 939-40 (November 2, 2009, grievance stating, "I am woke up and then he antagonizes me by telling me that 'you're going die [sic]; they are going to kill you punk; you ain't shit and your fucking grievances aren't shit either"); Ex. 14 at 938 (November 4, 2009, grievance, stating "CO waoke [sic] me up by standing at my cell door holding his flashlight in my eyes and telling me that I am going to kill you punk, no one cares what you say"); Ex. 14 at 941 (October 27, 2009, grievance stating that a correctional officer "hollered out 'is your sissy ass still crying about that [sleep deprivation] bullshit. You need to fucking grew [sic] up you are nothing but a bitch . . . I don't give a fuck about your grievance – I will kick your ass…'"). But on at least one occasion, the officer Mr. Purkey accused of such harassment was not even on duty at the time the allegations supposedly took place. Ex. 14 at 933 (November 23, 2009, grievance).

81.     When a staff member confronted Mr. Purkey with this information, Mr. Purkey accused him of "glaring[ly] attempt[ing] to cover-up yet again further abuses by his fellow government workers." Ex. 14 at 823 (December 2, 2009, grievance). Mr. Purkey was so convinced that his version of events was the truth that he demanded the staff consult the "camera setting [sic] just feet from my cell," as he often does whenever accused of making false allegations. *Id*. *See also* Ex. 14 at 818 (December 22, 2008, grievance claiming "the cameras on

---

[4] Though Mr. Purkey has been fixated on C.O. Hatfield's involvement in this "campaign of retaliation," which Mr. Purkey believes he initiated, he has referred to C.O. Hatfield by at least three different names. Ex. 14 at 897. *See, e.g.*, Ex. 14 at 941 (October 27, 2009 grievance saying Hailfile); Ex. 14 at 938 (November 04, 2009, grievance saying Hailfield); Ex. 14 at 897 (November 16, 2010, Declaration of Wesley Purkey saying Halfhill).

35

the range will clearly verify" his allegations); Ex. 14 at 918 (August 3, 2010, grievance stating "the camera on the range will verify this cop's malicious retaliatory actions being taken against me"); Ex. 14 at 906-07 (October 3, 2010, grievance stating, "The cameras on the range will verify these episodes and numerous others"). Often, review of video from the cameras at the prison proves that Mr. Purkey's claims are derived, not from reality, but from his delusions and paranoia. *See, e.g.*, Ex. 14 at 896 (March 7, 2011, Letter from Warden stating, "The appropriate staff member was interviewed, along with a review of the cameras, and it has been determined the staff member was adhering to established procedures in a professional manner"). On such occasions, this response merely feeds Mr. Purkey's paranoia, as he becomes convinced the administrative staff have "have turned a blind eye and a deaf ear to the evidence depicted on the camera." Ex. 14 at 899 (November 16, 2010, Declaration of Wesley Purkey).

82.     The frequency with which Mr. Purkey has filed grievances further illuminates his paranoia and delusional thinking.  First, Mr. Purkey tends to file the same grievances repeatedly. At times, this repetitive filing seems to be motivated by Mr. Purkey's belief that the prison staff are "doing everything they can to impede and thwart me from seeking redress . . . through the grievance process." Ex. 14 at 980-81 (August 10, 2000, grievance). *See also* Ex. 14 at 966-67 (December 22, 2008, grievance stating, "because Mr. Julian, English and Ryherd have and continue to deny me access to administrative [grievance] forms I was required to borrow this one"); Ex. 14 at 901-02 (October 15, 2010, grievance stating, "Unit Team Edwards has clarified that he will not process any further grievances"); Ex. 14 at 899 (November 16, 2010, Declaration of Wesley Purkey stating, "I have not been allowed to file any grievances – Period!"); Ex. 14 at 891-92 (August 8, 2013, grievance alleging the "invention of a screening process by prison office to reject a prisoners [sic] otherwise legitimate grievance"). But as staff have repeatedly

36

Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 38 of 58

clarified, and as the sheer volume of grievances Mr. Purkey continued to file confirms, Mr.

Purkey's perception about his access to the grievance process is far from accurate. In an Inmate

Request to Staff Member Response, the Unit Manager explained to Mr. Purkey:

> As for your access to the administrative remedy process, in the first eight
> months of 2012, you have been issued 48 informal resolution forms; eight in
> January, five in February, 15 in March, three in April, five in May, three in
> June, three in July, and six in August. Further review of your allegation reveals
> that you have filed 23 formal written Administrative Remedy Request, 20
> on the BP-229 (BP-9), and three Regional Administrative Remedy Appeal, BP-
> 230 (BP-10). Therefore, evidence suggests you have not been denied access to
> the agency's administrative remedy process.

Ex. 14 at 893. *See also* Ex. 14 at 958 (January 8, 2009, Letter from Warden stating, "Purkey has

filed over 140 administrative remedies and . . . [t]here is no indication he is being denied access

to the administrative remedy program"). Nevertheless, Mr. Purkey periodically sends grievances

to his defense team to file in order to prevent the prison staff from tampering with or destroying

his complaints. Ex. 5 at 42. *See also* Ex. 14 at 914 (Letter stating on August 31, 2010, Mr.

Purkey mailed his attorney a grievance he believed a correctional officer had urinated on).

83.     Occasionally, Mr. Purkey's repetitive filings are explained by his memory loss.

On numerous occasions, he forgot he had already filed a grievance on the subject matter at issue.

*See e.g.* Ex. 14 at 890 (August 9, 2013, grievance stating, "Two hours after submitting the

attached BP-8 with allegation for retaliatory taking of my religious diet Case Manager Shephard

returns the BP 8 with his reponse [sic] (which demonstrates acute biasness) whereas he in

mindboggling fashion claims that I have previously filed on this issue"). Most often, however,

Mr. Purkey seems to file the same grievance multiple times because he cannot comprehend nor

accept the responses provided by the prison administration. For example, despite repeatedly

being told directly that "the filing of grievances or lawsuits has no impact on the decision of

Case 1:19-cv-03570 Document 1 Filed 11/26/19 Page 38 of 58

whether you will be advanced to Phase II," Mr. Purkey continues to file several grievances accusing staff of retaliation each time he is denied Phase II classification. Ex. 14 at 973 (February 14, 2007, Letter from Warden to Mr. Purkey). *See also* Ex. 14 at 878 (July 26, 2018, grievance alleging "retaliatory denial of my Phase II placement . . . which repeated denials, included the most recent as of July 22nd., 2018 is based on deep rooted animus for the assistance being provided to other inmates in preparing, filing and prosecution litigation").

84. Mr. Purkey's deep and sustained delusions around the campaign of retaliation towards him has led to numerous *pro se* filings which undermine his broader legal interests. Prior to receiving a death warrant, Mr. Purkey had filed several motions to withdraw his appeals and/or expedite his execution without consulting counsel, citing delusional retaliation beliefs as the impetus. *See, e.g.*, Ex. 15 at 1118, 1121 (February 14, 2007, Motion to Withdraw Habeas Counsel(s) To Waive Habeas Proceedings and for Execution Date to Be Set, citing "malicious and abusive treatment for filing grievances on his behalf and other death row inmates"). In 2011, Mr. Purkey filed to withdraw his appeals in part because:

> [W]hen Purkey complained about fecal matter being mixed in with his food, and other food items being spit on the USP/TH Legal Department contacted Purkey's habeas attorney, i.e. Gary Brotherton and advised him that they would subject Purkey to disciplinary action if he persisted with such complaints.

Ex. 15 at 1092 (August 10, 2011, Motion to Withdraw Appeals). Among other acts of alleged retaliation, Mr. Purkey also claimed:

> After seeking redress for homosexual activities permeating the SCU by SCU 12-8 a.m. staff Purkey was subject to yet further acts of retaliation such as; 1) his correspondence mailed was destroyed by the 12-8 shift who process such for mailing on that shift; 2) had chemicals sprays [sic] into his cell by the 12-8 a.m. shift which cause Mr. Purkey extreme distress and breathing problems; and 3) he was yet again threatened with disciplinary action by USP/TH Legal Dep't via [his counsel] Mr. Brotherton if he continued to wage such complaints against staff.

38

Case 2:19-cv-00517-JMS-DLP    Document 81-1    Filed 07/14/20    Page 40 of 59 PageID
Case 1:19-cv-03570    Document 1-1    Filed 11/26/19    Page 39 of 58
#: 638

*Id*. In 2017, Mr. Purkey filed a motion to expedite his execution, because:

> After United States Penitentiary, Terre Haute, Staff literally destroyed Purkey
> legal correspondence that he ahd [sic] provided to them for mailing, as well as
> being forced over the past two and a half years to destroyed over two-thirds of his
> legal materials anent his capital proceedings coerced counsel turned a blind eye to
> such destruction and malicious actions by USP/TH Officials advising Purkey that
> he needed to deal with these problems himself. Purkey has available [sic] himself
> of all administrative efforts to address these malicious actions by USP/TH Staff
> and continue to suffer a plight of retaliation for such efforts that counsel has well
> turned a deaf ear and a blind eye to.

Ex. 15 at 1038 (February 17, 2017, Petition for a Writ of Mandamus to Relieve Purkey of

Coerced Counsel and for a Expeditious Execution Date to be Scheluded [sic]). In 2018, Mr.

Purkey signed a declaration stating "Because of ongoing retaliation being taken against me . . . I

have filed a motion with the court for a expeditious execution date to be scheluded [sic]." Ex. 14

at 872-73 (November 7, 2018, Declaration of Wesley Purkey) Some of the acts of retaliation by

staff that Mr. Purkey references include "deliberately interferring [sic] with [his] legal calls to

my capital habeas attorneys," pouring "piss" on his laundry bags, and "forc[ing him] to deal with

caked feces underneath the bunk and table." *Id*. Again on May 13, 2019, Mr. Purkey filed a

petition to expedite execution of his death sentence. Ex. 15 at 1031. As an explanation for this

request, Mr. Purkey offered:

> In fact on this date as in the protracted 5 or 6 years subjected Purkey [sic] to
> fabricated disciplinary action, denied him access to the law library and subjected
> him to a plethora of reprisals for Purkey addressing issues of his confinement and
> assisting other inmates with issues of their death row confinement. Other issues of
> Retaliation by SCU staff have been forcing Purkey to reside in feces covered
> cells' [sic] and/or inciting other inmates against Purkey, labeling him as a snitch.

*Id*.

85.    While Mr. Purkey frequently files motions to expedite his execution, or withdraw

his claims, he just as frequently files to rescind these motions, illustrating his sharp vacillation.

39

Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 40 of 58

*See, e.g.*, Ex. 15 at 1116-17 (March 1, 2007, filing to rescind his motions to withdraw and motion to set an execution date just two weeks after his initial filing); Ex. 15 at 1081-82 (September 20, 2011, filing to withdraw his Motions to Withdraw Appeals and to Withdraw Counsel which was filed only one month before); Ex. 15 at 1036 (filing a "correspondence/pleading. . . withdrawing the writ of mandamus filed to proceed pro se and for the execution date to be schedule" which had been filed less than two weeks before); Ex. 15 at 1258 (on September 13, 2019, the Southern District of Indiana received a single page Motion to Rescind Petitioner's Pro Se Motion to Withdraw Petition(s) that had been written by Mr. Purkey mere days after his initial motion to withdraw). Because of Mr. Purkey's sharp vacillation about whether he wants to be executed and his unwavering fixation on fictitious retaliation, Mr. Purkey is convinced his execution is a byproduct of his jailhouse lawyering rather than his repeated volunteering for execution.

> **C.      Mr. Purkey's dementia and marked decline over the past few years have exacerbated his long-term symptoms.**

86.      Mr. Purkey has Alzheimer's disease, a progressive neurodegenerative disease that impacts memory, intellectual function and behavior. Ex. 3 at 20-33. *See also* Ex. 9 at 89 (Testing, medical and family history "strongly suggest" in 2016 that "Mr. Purkey is currently suffering the beginning stages of a cortical neurodegenerative disease, such as dementia"); Ex. 12 at 120  (describing the reports of cognitive, physical and psychiatric decline and finding that this "reported change is very much consistent with progression of a cortical dementia"); *see also*, Irving B. Weinder and W. Edward Craighead, ed., The Cornsini Encyclopedia of Psychology, 4ed. Vol 1., p. 71 (2010) (describing Alzheimer's Disease).

87.      In the last two years, Mr. Purkey's legal team has witnessed his accelerating physical and mental decline. Ex. 7 at 70. Mr. Purkey now frequently slurs his words, something he did not do previously, and his stutter, a feature since childhood, has become far more

40

Case 2:19-cv-00517-JMS-DLP70 Document 81-1 Filed 07/14/20 Page 42 of 59 PageID
Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 42 of 58
#: 640

pronounced. Ex. 1 at 3, 10; Ex. 5 at 44; Ex. 7 at 73. He has lost weight and he is more easily

fatigued by visits with this legal team. Ex. 7 at 44. The right side of his face sags, and the right

side of his mouth does not move when he talks. Ex. 1 at 10.

88.    Legal visits with Mr. Purkey underscore his significant memory problems. Ex. 7

at 44. While Mr. Purkey has always struggled to remember names, this problem has become

noticeably worse. Ex. 5 at 45-47; Ex. 7 at 70-71. He has forgotten the names of some of the

most important people in his life, including confusing his aunt's name with his mother's,

forgetting the name of his ex-wife, and forgetting the name of his niece with whom he has

remained in close contact while on death row. *Id*. At various points, he has forgotten the name of

his current lawyers, Rebecca Woodman and Michelle Law, who have represented Mr. Purkey for

five years, and on other occasions he confused Rebecca Woodman with a former lawyer. Ex. 5 at

46.

89.    He has also forgotten people and events in recent years. For example, he did not

recognize a childhood friend when looking at his picture, and did not remember someone from

death row at Terre Haute, where he has been incarcerated for over a decade. Ex. 7 at 70-71. He

frequently forgets his requests, at times made just the day before. Ex. 7 at 73. He has forgotten

significant events, like how or when he got divorced. Ex. 5 at 44. In the last year, he has

forgotten dates that he knew previously, like his mother's birthdate and the date of her death. Ex.

5 at 45. He repeats the same stories, "completely unprompted, as if he is reading from a script,"

within the same legal visits without even realizing he is doing so. *Id*. He repeatedly requests the

same documents, because he forgets he has received them. Ex. 5 at 49. Similarly, he forgets

conversations he has had with his attorneys, wherein they have shared information about his

case. Ex. 7 at 72. He is often confused as to what day of the week it is. Ex. 5 at 49.

41

Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 42 of 58
#: 641

90.     At times, Mr. Purkey tells the same stories with different endings, each time, believing them to be sincere descriptions. For example, in the very same visit he told the investigator that he thought he met his childhood friend in second grade and then later, without referencing the earlier statement, said it was sixth grade. Ex. 5 at 45. He described his relative as from El Paso and then Tucson in the same visit. *Id*. He relayed two entirely different versions of a phone call with his daughter, each time appearing to genuinely believe the version he was telling was the truth. Ex. 7 at 71. Mr. Purkey has memories that are clearly false, and yet he continues to believe them even after correction. For example, he remembers that the jury in his case deliberated at the guilt phase for 13 to 14 hours, when in fact, it only deliberated for two hours. Ex. 5 at 46.

91.     Mr. Purkey struggles to find words, and it takes him longer to express himself. Ex. 7 at 73. Sometimes he simply cannot come up with the correct word and has to resort to describing the item he meant. For example, once he could not remember the term "flash drive" or "thumb drive," so instead he said, "that little thing that would let [him come and go with all [his] documents." Ex. 7 at 73. He frequently uses the wrong word or made-up words. Ex. 5 at 42-43. For example, he said "per batim" instead of "verbatim," or "abolish" when he meant "admonish." Ex. 5 at 43. Mr. Purkey described an apple pie in his hand as "chocolate." Ex. 7 at 74

92.     His conversations often reflect confused thinking. For example, in one visit, Mr. Purkey did not realize that his brother was also the grandson of their mutual grandmother. Ex. 5 at 46. Another time, he said that Terre Haute offered "a diabetic diet via facsimile only," and recounted that his granddaughter did not want to visit the prison because she did not "want to do math." Ex. 5 at 48. Mr. Purkey's memories are disjointed and often nonsensical.

93.     Mr. Purkey's cognitive decline, including in memory loss, is evident from neuropsychological testing administered in 2003 and 2016, and from expert evaluations in 2016 and 2019.  In 2003, Dr. Bruce Leeson administered neuropsychological testing that indicated areas of potential deficits, particularly in executive functioning, consistent with brain damage. *See* Ex. 13 at 614-18; Ex. 9 at 81.  Although a psychologist retained by the Government, Daniel Martell, Ph.D., disagreed with some of Dr. Leeson's interpretation of Mr. Purkey's results, he agreed that the Test of Variable attention (TOVA) suggested deficits worthy of additional investigation. Ex. 9 at 81.  All experts agreed that the 2003 testing did not reveal memory deficits.  *Id.*  Dr. Leeson's testing did reveal, however, moderate microsmia on the Smell Identification Test (SIT)—a marker of orbital frontal damage associated with behavioral disinhibition or an early marker of dementias, including Alzheimer's Disease and Frontal-Temporal dementia.

94.     In 2016, Dr. Robert Ouaou administered neuropsychological testing which showed impairments in executive functioning, as suggested in the 2003 testing. Ex. 9 at 88. In addition, the 2016 testing revealed significant learning and memory deficits, not observed in the 2003 testing.  *Id.* This result is evidence of the marked decline in memory since 2003. *Id.*

95.      The neuropsychological testing indicating cognitive deficits in executive functioning was consistent with brain imaging from 2003, when Mr. Purkey underwent positron emission tomography (PET) and magnetic resonance imaging (MRI) imaging.  The PET scan results were abnormal in both temporal lobes, the right frontal lobe, the right posterior parietal lobe, the amygdala, the hippocampus, and the cerebellum. The PET scan showed marked reduction in metabolism in the temporal lobes, more extensive in the anterior right temporal lobe, although also present in the anterior left temporal lobe. Ex. 13 at 708. The reduction was seen

43

bilaterally in both the amygdala, the part of the brain that processes risk and danger to events, and the hippocampus, the part of the brain responsible for memory and ability to learn from recent events. *Id*. The PET scan also revealed a reduction in the medial aspect of the temporal lobes, consistent with a quiescent (inactive) seizure focus, and suggestive of the likelihood of temporal lobe seizures. *Id*. The PET scan showed significant reductions in activity in the right front lobe, responsible for weighing future actions and planning, and the right posterior parietal lobe, the area associated with ability to understand social context. *Id*. at 709.

96.     The MRI results showed minor but definite changes in Mr. Purkey's brain, in the form of periventricular (the area surrounding the ventricles of the brain) white matter foci. Ex. 13 at 709. These are areas of cerebral white matter that appear hyperintense on imaging. *See* generally, Ki Woong Kim, et al, *Classification of white matter lesions on magnetic resonance imaging in the elderly*, 64 Biol Psychiatry, 273 (2008). Although they are sometimes found in healthy elderly people, they are consistent with dementia as well as major psychiatric disorders including major depressive disorder, bipolar disorder, and schizophrenia. *Id*.

97.     Dr. Jonathan DeRight administered additional neuropsychological testing in August of 2019. Based on this evaluation, Dr. DeRight diagnosed Mr. Purkey with Alzheimer's disease. Ex. 3 at 27-28. Dr. DeRight administered two common screening tools for Alzheimer's, both of which were suggestive of Alzheimer's disease, the Mini Mental State Exam and the clock Drawing Test. On the MME, he scored 24 correct, falling well within the range of a positive screen for Alzheimer's Disease. Ex. 3 at 26. His copy of the clock drawing was extremely low, below the first percentile. Ex. 3 at 32. He also had remarkably low scores in multiple areas significant for memory testing. Ex. 3 at 27. He scored in or below the first percentile in number sequencing, categories identification on the Modified Wisconsin Card

44

Sorting Testing, facial recognition discriminability, copying the Rey Complex Figure, and recall of the figure. Ex. 3 at 30-32.

98.     Dr. DeRight opined that the collateral information about Mr. Purkey's decline was also highly consistent with Alzheimer's disease.  Mr. Purkey's worsening cognitive symptoms, including paraphasic word efforts, word loss, impaired recall of information he knew before, and incontinence, are indicative of the progression of Alzheimer's disease.  *See* Ex. 3 at 27.

99.     The Alzheimer's diagnosis is also consistent with Mr. Purkey's long family history of neurogenerative diseases and mental illness on both his paternal and maternal sides of the family. Ex. 3 at 21. Several members of his mother's side of the family had neurogenerative diseases.  His great-aunt Ms. Burke had "organic brain syndrome" at the time of her death. His great-uncle William Haberthier had Parkinson's disease and his great-great grandmother, Anna Haberthier was found incompetent because of her condition of "senility." Ex. 35 at 1528-33 (Anna Haberthier guardianship).

100.    Mr. Purkey's mother, Velma Johnson, struggled with mental illness, anxiety and depression throughout her life, and was institutionalized in the psychiatric ward at St. Francis hospital on at least five occasions. Ex. 13 at 220-222, 223-227, 242-246, 247-251, 252-255. She was also an alcoholic, who was hospitalized multiple times for detoxification. Ex. 10 at 94-97; Ex. 13 at 242-246, 252-255, 302-311, 312-327; Ex. 44.

101.    Mr. Purkey's father Jack Purkey served in World War II as a young man, and for decades of his life after his discharge, suffered from anxiety, depression, "nervous spasms" and alcoholism, requiring multiple inpatient hospitalizations. Ex. 13 at 186-90, Ex. 42 at 1642-45. He committed suicide in 1984 when he was 60 years old. Ex. 13 at 330-33.

45

102.    Neurogenerative diseases runs through Mr. Purkey's father's family, too. Mr.

Purkey's paternal aunts, Marguerite Hotchkiss and Irene Barlett, his paternal great-grandmother,

Nancy Ida Purkey, and his great-uncle, Roy Purkey, all had neurogenerative diseases. Ex. 18 at

1464-65; Ex. 37 at 1627; Ex. 40 at 1641; Ex. 43 at 1651. Like Mr. Purkey, his father and several

of his siblings also stuttered. Ex. 13 at 806; Ex. 43 at 1651.

**D.      Mr. Purkey's long-term inability to effectively communicate with counsel is
evidence of his present incompetence.**

103.    Mr. Purkey's inability to rationally communicate with counsel at every stage in

his capital proceedings is readily apparent from the record. *See, e.g.*, Ex. 13 at 590 (Order noting

trial counsel's assertion that, "Mr. Purkey's condition has deteriorated to such a significant

degree that be now cannot assist counsel. Mr. Purkey simply cannot focus on the case, and

discuss case-related matters, because of the psychic difficulties which he is experiencing"); Ex.

13 at 807 (declaration from post-conviction counsel stating, "His complex mental health

problems made it difficult for him to meaningfully participate in his defense. Mr. Purkey's

competence became our main mental health concern"); Case No. 2:19-cv-414, Dkt. 61, at 5 (*Ex

Parte*) (present "counsel themselves have a significant basis for believing Mr. Purkey to be

incompetent based on mental impairments and onset of dementia"). This history further supports

Mr. Purkey's present inability to rationally understand the reason for his impending execution.

Though his defense team has repeatedly sought to advise him about his execution set for

December 13, 2019, his incompetence has consistently interfered. This Court should consider his

Case 1:19-cv-03570 Document 1 Filed 11/26/19 Page 48 of 58

past and present difficulties communicating with counsel as evidence of his current incompetence under *Ford* and *Panetti*.[5]

104.    For over a decade, Mr. Purkey has repeatedly and indiscriminately filed motions to fire counsel that are riddled with evidence of his severe mental illness and paranoia. Throughout these motions, Mr. Purkey describes a "complete breakdown in communication" based on his belief that counsel said and did things that never actually happened. Ex. 15 at 1374-78 (September 18, 2013, Motion for An Extension of Time for Filing Petition for Panel Re Hearing and to Withdraw Counsel and to Proceed Pro se in these Proceedings). For example, in his third motion to withdraw post-conviction counsel over a five month period, Mr. Purkey

---

[5] Unlike the States, the federal government has neglected to promulgate statutory procedure or protocol administering *Ford* and *Panetti*. The majority of states that have considered the issue have determined that the ability to consult with counsel rationally is relevant to the question of an individual's sanity at the time of execution. In nine states, statutes or case law provide for consideration of a defendant's capacity to assist counsel in determining competency for execution. *See* Alabama, Ala. Code § 15-16-23; Colorado, Colo. Rev. Stat. §§ 18-1.3-14; Mississippi, Miss. Code Ann. § 99-19-57(2); Missouri, RSMo § 552.060.1; Nebraska, Neb. Rev. Stat. Ann. § 29-2537 (LexisNexis 2010); North Carolina, N.C. Gen. Stat. Ann. § 15A-1001(a); Ohio, Ohio Rev. Code. Ann. § 2949.28-29; Oklahoma, *Bingham v. State*, 169 P.2d 311, 314-25 (Okla. Crim. App. 1946); South Carolina, *State v. Downs*, 631 S.E.2d 79, 81 (S.C. 2006). Only six states explicitly reject capacity to assist counsel as a valid consideration. *See* Arkansas, Ark. Code Ann. § 16-90-506(d)(1)(b)(i); Florida, Fla. Stat. Ann. § 922.07; Indiana, *Overstreet v. State*, 993 N.E.2d 179 (mem) (Ind. 2013); Kentucky, KRS § 431.213(2); Pennsylvania, *Com. v. Watson,* 952 A.2d 541 (Pa. 2008); Tennessee, *State v. Irick*, 320 S.W.3d 284, 294 (Tenn. 2010). Further, the American Bar Association has recommended that jurisdictions adopt procedures that preclude the execution of prisoners with a mental disorder that impairs their capacity to understand or communicate pertinent information or otherwise assist counsel. ABA Task Force on Mental Disability and the Death Penalty, Recommendation and Report on the Death Penalty and Persons with Mental Disabilities, 30 Mental & Physical Disability L. Rep. 668, 673 (2006).

accused counsel of employing "commandeering, controlling and strong-arm tactics denying Purkey the right to assist in these [post-conviction] proceedings," refusing to respond to any of his correspondence "with the exception of one (1) time," and deleting issues from filings "behind [his] back." Ex. 15 at 1432. In 2011, Mr. Purkey again filed a motion to remove these same attorneys from his case, providing the following as an explanation:

> Both Teresa Norris and Gary Brotherton have reiterated many times over that they will not allow Purkey to assist in these habeas appellate proceedings, and have clarified through Gary Brotherton's statement that, "we will run roughshod over your case and there is absolutely nothing that you can do about it." In fact this declaration has been reiterated many times over the past three and a half years when Purkey has tried to discuss issues of both law and fact predicating his habeas proceedings.

Ex. 15 at 1084 (August 23, 2011, Motion to Withdraw Counsel and Proceed Pro Se). In the same motion, Mr. Purkey also accused his counsel of stating, "they are 'sick and tired' of hearing Purkey whine about the conditions of his confinement on death row," that "he had no right to complain," and that "Purkey needed to suck this up and deal with it." *Id*.

105.     Despite such serious and repeated accusations, the court never granted Mr. Purkey's motions to remove his post-conviction counsel from his capital case. *See, e.g.*, Ex. 15 at 1053, 1056 (May 16, 2012 Motion to Withdraw Appellant Counsel And For Leave Of The Court To Proceed Pro Se, noting "animus by counsel against Purkey" and citing, among other accusations, his attorneys response "we are tired of hearing you cry about the b.s. on the unit" after Mr. Purkey informed them of retaliation by prison staff); Ex. 15 at 1048 (September 18, 2013, Motion for An Extension of Time for Filing Petition for Panel Re Hearing and to Withdraw Counsel and to Proceed Pro se in these Proceedings, claiming that his counsel told him "it did not matter whether Purkey lived or died because they would be paid"). Mr. Purkey's motions to fire counsel were often quickly followed by motions to rescind such requests. *See,*

48

*e.g.*, Ex. 15 at 1081 (September 20, 2011, Motion to withdraw, requesting to withdraw his Motions to Withdraw Appeals and to Withdraw Counsel which was filed only one month before). This sharp vacillation significantly hindered his ability to work with counsel. Post-conviction counsel described her representation of Mr. Purkey, stating "Every day was an effort to keep Mr. Purkey from flying off in a completely different direction so that he could work with us productively enough to get the § 2255 petition filed and litigated without him constantly threatening to file motions to proceed pro se or to waive his litigation because he was upset about other things." Ex. 13 at 815.

106. Additionally, Mr. Purkey's fixation on illogical ideas has been an obstacle in his ability to effectively communicate with every attorney who has ever worked on his capital case. Ex. 13 at 815 (former counsel noting "Mr. Purkey had entrenched opinions about what needed to be done on this case, and he was not willing to entertain my opinions if they were contrary to his rigid way of thinking"). For instance, from trial through habeas proceedings, Mr. Purkey has demanded that his counsel investigate the "terroristic campaign against [him] for a fifteen month period" orchestrated by his ex-wives, the FBI, the Kansas Bureau of Investigations, and the DEA "in the name of revenge." Ex. 5 at 40; Ex. 14 at 978-79. *See also* Ex. 7 at 72 ("Wes was often fixated on proving Claire poisoned him and frequently demanded that his defense team investigate it further"). In a Letter to his trial counsel on January 20, 2002, Mr. Purkey wrote:

> Is there anyone out there who gives a shit about this information? As I previously told you – the fucking DEA was involved in what happened to me in Wichita – the magnitude of this case is unbelievable and I realize as much but god damn it it's the fucking truth! . . . Don't let me be served the same placebo representation I fell prey to at stinking fucking Wyandotte County.

Ex. 14 at 978-79. As another example of Mr. Purkey's illogical fixations interfering with his ability to work with counsel, post-conviction counsel described an incident in which "he mailed

49

[her] a bag of stale potato chips he had been served with his prison meal and insisted that [she] fight that grievance battle for him. When [she] declined it became a huge issue for him as most things did." Ex. 13 at 814. *See also* Ex. 5 at 54 (stating that when she refused to leave records with Mr. Purkey at the prison, "[h]e became irrational stating that the records about John [whom he had never met] that he had just seen for the first time that day meant more to him than life itself"); *id*. (stating that Mr. Purkey has repeatedly and inaccurately asserted over the last five years that he never gave his current counsel Rebecca Woodman and Michelle Law permission to work on his case).

107.    Mr. Purkey's ability to work with his present counsel has also been severely encumbered by his delusion-based belief that they are conspiring with prison officials to have him executed in retaliation for filing grievances and lawsuits challenging the conditions of death row. As the mitigation specialist on his defense team described: "When [his attorneys] do not do as he says, Wes internalizes that decision as evidence of their desire to cause him harm, and more specifically, for him to be executed. In this way, he sees them as part of the conspiracy against him and his efforts to litigate against the prison." Ex. 5 at 54. Mr. Purkey's paranoia and distrust of his counsel is so severe that three months before his scheduled execution date, he told them he was going to remove them from his visitation list and accused them of having lied to him for five years to promote their "hidden agenda." Ex. 5 at 55.

108.    Though Mr. Purkey's attorney-client relationships have been crippled for years by his belief that he is represented by attorneys who are not motivated by his interests, his dementia has only exacerbated the problem.  *Id*. As Dr. Agharkar opined:

> The lack of rationality from Mr. Purkey's delusional thoughts and paranoia are compounded by the deterioration of his brain from his dementia. As his brain deteriorates, the problems of paranoia worsen and become a self-reinforcing cycle. The paranoia makes it hard for him to deliberate and weigh new

50

information. He does not trust anyone, and that distrust is heightened by his memory failings and complex PTSD. He lacks the ability to know who is trying to hurt and who is trying to help him.

Ex. 1 at 12. Mr. Purkey's memory problems fuel his belief that his attorneys are lying to him and secretly working against him. In October 2019, for example, Mr. Purkey lashed out at his mitigation specialist because he did not remember that his attorneys would not be joining her on the legal visit. Ex. 5 at 49. When she offered to write down any information he wanted relayed to his attorneys, he refused, "noting that doing so would just give the appearance that they were working on his case." *Id*. He then abruptly ended the visit after she corrected him about the date his attorneys were next scheduled to visit. *Id*. Mr. Purkey's execution date is less than a month away, and counsel struggle to maintain a working relationship with him, as he sometimes cannot even remember the names of those on his defense team. Ex. 5 at 46.

## VI. CLAIMS FOR RELIEF
## COUNT I.

### (Eighth Amendment Violation – Cruel and Unusual Punishment)

The foregoing allegations are repeated and incorporated as though fully set forth herein.  The Eighth Amendment's bar on cruel and unusual punishment prohibits the execution of persons who are incompetent to understand the basis for their executions.  *Ford v. Wainwright, supra,* at 409-10 (the Eighth Amendment prohibits execution of person who lacks "capacity to come to grips with his own conscience or deity," both to "protect the condemned from the fear and pain without comfort of understanding" and to "protect the dignity of society itself from the barbarity of exacting mindless vengeance").  *See also Panetti,* 551 U.S. at 957 ("The Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane"). The Eighth Amendment prohibition bars the execution of persons "suffering from dementia" who

Case 1:19-cv-03570 Document 1 Filed 11/26/19 Page 52 of 58
#: 651

lack understanding of the basis for their execution. *Madison*, 139 S.C.t at 727. The *Ford* prohibition is echoed in the federal statutory commandment that "a sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person." 18 U.S.C. § 3596(c).

109. Critically, Mr. Purkey does not seek relief from his sentence; he simply seeks to have his sentence carried out in a manner consistent with the Eighth Amendment. Defendant's plan to execute Mr. Purkey violates the Eighth Amendment because Mr. Purkey currently does not rationally understand the basis for his execution.

110. The petitioners in *Ford* and *Panetti* are illustrative of the standard for incompetence to be executed. Like Mr. Purkey, Alvin Ford's mental illness developed over time; he "began to manifest gradual changes in behavior. They began as an occasional peculiar idea or confused perception, but became more serious over time." *Ford v. Wainwright, supra* at 402. They manifested into "obsessions[s]," and letters "reveal[ed] endless brooding" and paranoia. *Id*.

111. Mr. Purkey's mental condition, described by the lawyers and investigators with whom he has come into contact as well as by experts who have evaluated him over decades, reveals similar deterioration, paranoia, and delusion. *See, e.g.*, Ex. 1 at 9 ("In addition to Mr. Purkey's longstanding poisoning delusions, he has for many years adhered to a delusional belief system that the guards and prison are engaged in systemic retaliation against him for his legal work"); Ex. 13 at 561 (May 15, 1981, psychiatric evaluation reporting auditory hallucinations as Mr. Purkey held two conversations at the same time, "whisper[ing] in an entirely different conversation from what he [was] talking aloud."); Ex. 13 at 345 (May 1998 emergency room record noting Mr. Purkey was admitted because he "started to act paranoid," stating that "they"

52

were watching him at all times and sprayed him with "poisonous mist several times" while he was sleeping"); Ex. 5 at 40 ("Early in my involvement [as Wes's mitigation specialist], Wes began exhibiting delusional thinking"); Ex. 7 at 74 ("Wes was constantly paranoid that various prison officials were trying to harm him in retaliation for his jailhouse lawyering," and his "paranoia also increased over time.").

112.    The Supreme Court granted certiorari in *Panetti* to clarify the *Ford* standard. Like Alvin Ford and Wesley Purkey, Scott Panetti was diagnosed with severe mental illness and verbalized elaborate paranoid and delusional beliefs far removed from reality. According to the expert in *Panetti*, "although petitioner claims to understand 'that the state is saying that [it wishes] to execute him for [his] murders,' he believes in earnest that the stated reason is a 'sham' and the State in truth wants to execute him 'to stop him from preaching.'" *Panetti,* 551 U.S. at 955 (citations omitted).  The Fifth Circuit Court of Appeals found that Scott Panetti's "awareness" that he was to be executed and that he had been convicted of murder was sufficient to support a finding that he was competent to be executed, even if his awareness fell short of a "rational understanding." *Id.* at 956.  The Supreme Court unequivocally rejected this position as an unreasonable interpretation and application of *Ford*:

> The Court of Appeals' standard treats a prisoner's delusional belief system as irrelevant if the prisoner knows that the State has identified his crimes as the reason for his execution. *See* 401 F. Supp. 2d, at 712 (indicating that under Circuit precedent "a petitioner's delusional beliefs -- even those which may result in a fundamental failure to appreciate the connection between the petitioner's crime and his execution -- do not bear on the question of whether the petitioner 'knows the reason for his execution' for the purposes of the *Eighth Amendment*"); see also *id., at 711-712.* Yet the *Ford* opinions nowhere indicate that delusions are irrelevant to "comprehension" or "awareness" if they so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution. If anything, the *Ford* majority suggests the opposite.

*Id.* at 960.

Case 2:19-cv-00517-JMS-DbP  Document 81-1  Filed 07/14/20  Page 55 of 59 PageID
Case 1:19-cv-03570  Document 1-1  Filed 11/26/19  Page 54 of 58
#: 653

113.     Writing for the Court, Justice Kennedy emphasized that "[a] prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." *Id.* at 959.  A rational understanding that the sentence of death was imposed as punishment for the crime of murder is an essential element of the *Ford* standard.  "Gross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose." *Id.* at 933.

114.     Just as in the cases of Alvin Ford and Scott Panetti, the Eighth Amendment bars Wesley Purkey's execution because his "mental state is so distorted by a mental illness that his awareness of the crime and punishment has little or no relation to the understanding of those concepts shared by the community as a whole." *Id*. at 959.  In support of this contention, counsel have proffered the report of Dr. Bhushan Agarkhar, a neuropsychiatrist who has twice examined Mr. Purkey. *See* Ex. 1 at 1-19. After his most recent examination of Mr. Purkey (in November 2019), Dr. Agarkhar concluded that "to a reasonable degree of medical certainty, at the time of the evaluation, Mr. Purkey lacked a rational understanding of the basis for his execution." Ex. 1 at 11-12. As in *Panetti*, Mr. Purkey "can recite the fact that his execution is for the murder of Jennifer Long, [but] he lacks rational understanding of that fact." *Id*. at 12. "This," Dr. Agarkhar explains, "is an example of parroting, rather than having a rational understanding." *Id*. Much like Scott Panetti, Mr. Purkey misunderstands the real reason for his execution, instead believing it is a "conspiracy of retaliation . . . for his legal work." *Id*. This "fixed belief" is "part of his long-standing delusions" (*id.*), which have persisted over decades, and are evidenced by numerous prior evaluations and institutional records as well as contemporaneous observations and opinions rendered by experts and defense team members. *See* Ex. 5; Ex. 7; Ex. 9; Ex. 10, Ex. 11, Ex. 12.

54

115.     Defendants, acting under color of law, intend to execute Mr. Purkey, even though he is incompetent.  Carrying out such an execution will violate the Eighth Amendment.

## COUNT II.

### (Due Process under the Fifth Amendment and Eighth Amendment)

116.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

117.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law."  U.S. Const. amend. V.

118.     Defendants announced plan to carry out Mr. Purkey's execution without providing a hearing violates the Fifth and Eighth Amendments.

119.     Because Mr. Purkey has a made a substantial showing of his incompetence to be executed, he is entitled to a hearing under Due Process and the Eighth Amendment.  In a *Ford* inquiry, due process requires that once a prisoner has made the "substantial showing of insanity" he is entitled to "the protection afforded by procedural due process," including a hearing at which to present evidence on the ultimate issue of competency. *See Panetti*, 551 U.S. at 949 ("Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution contingent upon the establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being." (quoting *Ford*, 477 U.S. at 411)).

120.    *Panetti* explains that Justice Powell's concurrence in *Ford* controls the minimum procedures for competency determinations. As Justice Kennedy set forth, the substance of these procedures emanates from *Ford*'s plurality opinion:

> Although the condemned prisoner does not enjoy the same presumptions accorded a defendant who has yet to be convicted or sentenced, he has not lost the protection of the Constitution altogether; if the Constitution renders the fact or timing of his execution contingent upon establishment of a further fact, then that fact must be determined with the high regard for truth that befits a decision affecting the life or death of a human being. Thus, the ascertainment of a prisoner's sanity as a predicate to lawful execution calls for no less stringent standards than those demanded in any other aspect of a capital proceeding.

*Panetti*, 551 U.S. at 948-49 (quoting *Ford*, 477 U.S. at 411-12). A "fair hearing" is necessary under *Panetti* and *Ford* because there are facts that must be established at the time of, or shortly before, an execution date to determine if sanity is an issue. *Panetti*, 551 U.S. at 948-49 (quoting *Ford*, 477 U.S. at 426).. Of course, this fact—that the condemned is sane—is the predicate for the retributive justification of death as a punishment. Without this fact, the punishment becomes indefensible. Determination of "this further fact" at the time of execution demands standards befitting "any other aspect of a capital proceeding." *Id.* This critical constitutional inquiry must be subject to the adversarial process and judicial scrutiny.

121.    Scott Panetti met the "threshold showing" when he filed a Renewed Motion To Determine Competency, supported by "a letter and a declaration from two individuals, a psychologist and a law professor, who had interviewed petitioner while on death row." *Panetti*, 551 U.S. at 938, 950. Here, Mr. Purkey has submitted hundreds of pages of evidentiary support demonstrating his current incompetence, as well as its historical underpinnings. In the present case, Mr. Purkey has made a "substantial threshold showing" and, accordingly, is entitled to "'fair hearing' in accord with fundamental fairness." *Id.* at 949 (quoting *Ford*, 477 U.S. at 426).

56

## VII.   PRAYER FOR RELIEF

Wherefore, in order to prevent Defendants from violating Mr. Purkey's rights under the under the Fifth, Sixth and Eighth Amendments to the U.S. Constitution and the Administrative Procedure Act as alleged above, Mr. Purkey requests that the Court:

**A.**   Issue a judgment declaring that Mr. Purkey is currently incompetent to be executed and that executing him in his present condition violates his rights as guaranteed by the Eighth Amendment to the United States Constitution.

**B.**   Conduct a full and fair evidentiary hearing to determine whether Mr. Purkey is currently competent to be executed under the Eighth Amendment to the United States Constitution.

**C.**   Enter an injunction preventing his execution during any period of incompetency, and lasting until such time as his competency may be restored.

**D.**   Grant further relief as the Court deems just and proper.

DATED: November 26, 2019

Respectfully Submitted,

/s/Charles F.B. McAleer, Jr.
Charles F.B. McAleer, Jr. (DC Bar #388681)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5963
Email: CMcAleer@milchev.com

/s/Brian Fleming
Brian Fleming (DC Bar #974889)
Miller & Chevalier Chartered
900 16th Street NW
Washington, D.C. 20006
Telephone: (202) 626-5871
Email: bfleming@milchev.com

Case 1:19-cv-03570 Document 1-1 Filed 11/26/19 Page 58 of 58

/s/Rebecca E. Woodman
Rebecca E. Woodman (*pro hac vice motion* to be filed)
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
Telephone: (785) 979-3672
Email: rewlaw@outlook.com

*/s/Michelle M. Law*
Michelle M. Law, MO Bar No. 45487
(appointment motion to be filed)
Assistant Federal Public Defender
Western District of Missouri
901 Saint Louis Street, Suite 801
Springfield, Missouri 65806
Telephone: (417) 873-9022
Facsimile: (417) 873-9038
Email: michelle_law@fd.org

**Counsel for Petitioner**