# Exhibit G

Defendants' Opposition to Plaintiff's Motion for Expedited Discovery, Purkey DC Ford Matter (D.D.C. June 29, 2020), ECF No. 27

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WESLEY I. PURKEY,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      Civil No. 19-03570 (TSC)
                                     )
WILLIAM P. BARR, et al,              )
                                     )
            Defendants.              )

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY

The Defendants respectfully oppose Plaintiff Purkey's motion for expedited discovery ("Discovery Mot.") for three reasons. First, Purkey has no entitlement to any discovery until he has made a substantial threshold showing of incompetency, and he has not. Second, Defendants respectfully suggest that this Court should resolve what both parties agree are "significant threshold issues" surrounding this Court's jurisdiction, Joint Mot. at 1, ECF No. 15, before imposing discovery obligations. Third, Purkey fails to satisfy the requirements for expedited discovery.

## BACKGROUND

Purkey asserts that he "has actively requested this evidence through every possible channel for almost a year." Discovery Mot. at 2. As an initial matter, Defendants note at least three alternative channels that Purkey could have pursued many months ago, but did not.

First, with respect to the requests for medical records and video surveillance, Purkey claims to have been requesting this information for months, but what he refers to are not discovery requests through litigation but requests for information under the Freedom of Information Act. *See* Woodman Decl. ¶¶ 12-13, 26, ECF No. 23-6. The remedy for alleged

failure to produce documents in response to a FOIA request is not expedited discovery, however, but a lawsuit under the FOIA statute. *See generally* 5 U.S.C. § 552(a)(4)(B). Purkey has not sought production of the records he requested under FOIA through a FOIA lawsuit—though this Court would unquestionably have the power to hear such a lawsuit, unlike this one. *See id.*

Second, with respect to the requests for medical testing, BOP informed Purkey's counsel that such requests would require a court order. Woodman Decl. ¶ 15, ECF No. 23-6. BOP does not order or pay for testing its medical professionals believe is not clinically indicated, and Purkey's treating medical professionals at BOP have determined that the tests sought are not clinically indicated. Watson Decl. ¶¶ 5-6. Purkey sought an *ex parte* court order in his pending § 2241 litigation in the Southern District of Indiana, and on November 20, 2019, the district court denied it because Purkey did not bring his *Ford* claim along with his then-pending § 2241 petition. Woodman Decl. ¶ 18, ECF No. 23-6.

Purkey could have brought his *Ford* claim in that § 2241 petition, as he admits that it was ripe at the time, Woodman Decl. Exh. 18, ECF No. 23-6. If he had, the district court in Indiana might have granted his request for the testing he believes to be necessary. As the Defendants have repeatedly argued, the Southern District of Indiana would have had jurisdiction over a *Ford* claim, and the Rules Governing Section 2254 Cases and Section 2255 Proceedings in the United States District Courts permit discovery for good cause.

Third, once Purkey instead filed his *Ford* claim in this Court on November 20, 2019, he could have then sought an order from this Court for the medical testing he believes necessary. He was aware that this channel was open to him, because he sought expedited discovery of his medical records, video surveillance, and brain imaging as part of his first motion for preliminary injunction on December 4, 2019. Memo. in Support of Mot. for P.I. at 22-23, ECF No. 7-1. But

-2-

less than two weeks later, Purkey sought leave to withdraw this motion, which this Court granted. Mot. at 1, ECF No. 11. In the six months before his most recent motion for preliminary injunction, Purkey did not seek an order from this Court for the testing he now seeks. The Defendants acknowledge their position that Purkey's *Ford* claim was unripe during this time, but Purkey did not adopt this position, and this Court has not yet decided the issue. *See* Mot. to Dismiss at 10-12, ECF No. 18; Opp. to Mot. to Dismiss at 7-12, ECF No. 20.

Purkey may have had even other options to pursue the information he now seeks, and he would have been prudent to make attempts to do so if he felt the information necessary to make the threshold showing required to obtain a *Ford* hearing. There certainly were channels through which Purkey could have sought, and if a court agreed he made the required preliminary showing of merit, could have obtained the discovery he now seeks. That he did not attempt to do so despite being aware not only that additional channels existed but also that the Attorney General could schedule his execution with as little as 20 days' notice, undermines the premise of his motion for expedited discovery—his claim that he needed the requested information but had no means to obtain it.

Purkey's present circumstance—moving to open discovery in a legal action filed six months ago because his execution date is three weeks off—is as much the result of the litigation decisions made by Purkey and his legal team as it is the Defendants' decision to schedule his execution within a lawful timeframe. This Court should not reward Purkey for those decisions by opening discovery now, or more particularly, by granting Purkey a preliminary injunction for the purpose of opening discovery now.

Purkey's motion for expedited discovery is intertwined with his renewed motion for a preliminary injunction. To resolve that motion, this Court must resolve the threshold issue of its

-3-

statutory power to grant relief in this case. The Defendants have maintained from their first filing in this case that Purkey cannot bring his *Ford* claims directly under the Eighth Amendment in this Court. Even if he could, Purkey has failed to allege plausible facts entitling him to relief. Because Purkey's suit should be dismissed, this Court need not order expedited discovery. Rather, it should dismiss the case.

## ARGUMENT

### I.    Purkey has failed to make the threshold showing required for discovery.

With respect to Purkey's due process claim, he lacks any entitlement to process—including discovery—because he has not made the threshold showing required. As explained more fully in Defendants' opposition to Purkey's renewed preliminary injunction motion, a *Ford* claimant is not entitled to a hearing or other procedural protections, including discovery, until he has made a substantial threshold showing of incompetency. *See Panetti v. Quarterman*, 551 U.S. 930, 949 (2007) ("Once a prisoner seeking a stay of execution has made a substantial threshold showing of insanity, the protection afforded by procedural due process includes a fair hearing in accord with fundamental fairness.").

Even accepting Purkey's well-pled facts, he has not made such a substantial threshold showing. As explained further in Defendants' opposition to Purkey's renewed preliminary injunction motion, at most Purkey has plausibly alleged that he does not understand the reason for scheduling his execution date. He is in fact pursuing a civil rights lawsuit in the Southern District of Indiana, which he initiated pro se, claiming that he was arbitrarily selected for an execution date because of his "jailhouse lawyering" and the fact that he is white. Compl. Ex. 15 at 1002-04, ECF No. 1-18. Just over a year ago, Purkey filed a handwritten pro se "Petition to Expedite Execution of Petitioner's Death Sentence Pursuant to 28 U.S.C. § 2241" in the

-4-

Southern District of Indiana. Compl. Ex. 15 at 1029, ECF No. 1-18. Purkey wrote in this petition that "[o]n January 23, 2004 U.S. District Judge Gaitan sentenced Purkey to death after a jury found him guilty of kidnapping resulting in death and recommended a sentence of death (WDMO Case No. 01-CR-00308-FJG-DCD 506)." Compl. Ex. 15 at 1029-30, ECF No. 1-18. Purkey's own handwritten petition demonstrates he understands he was sentenced to death for his crime and possesses a rational understanding of the reason for his execution.

Because Purkey is not entitled to discovery prior to satisfying his obligation to make the relevant threshold showing, this Court should deny expedited discovery.

## II.     This Court lacks authority to grant Purkey relief.

Purkey has also failed to show that this Court has authority to grant him the relief he seeks, including discovery, because if successful his claim will necessarily bar his execution and therefore must be brought in habeas in the Southern District of Indiana. Defendants provide arguments and authorities on this issue in their response to Purkey's renewed preliminary injunction, filed simultaneously with this response.

In summary, because "a grant of relief to the inmate will necessarily bar the execution," Purkey must bring his claim under 28 U.S.C. § 2241 and cannot bring it as an implied equitable action. *See Hill v. McDonough*, 547 U.S. 573, 580-83 (2006); *see also Nelson v. Campbell*, 541 U.S. 637, 643-44 (2004). *See generally Armstrong Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The power of federal courts in equity to enjoin unlawful executive action is subject to express and implied statutory limitations."). Because Purkey must bring his claim as a § 2241 habeas petition, he cannot bring it in this Court. *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004); *Day v. Trump*, 860 F.3d 686, 689 (D.C. Cir. 2017); *Stokes v. U.S. Parole Comm'n*, 374 F.3d 1235, 1238-39 (D.C. Cir. 2004). Purkey has sued the wrong parties in the wrong court.

-5-

Defendants respectfully suggest that because all parties agree these arguments and authorities present "significant threshold issues" about this Court's jurisdiction, Joint Mot. at 1, ECF No. 15, it should resolve them before ordering the Defendants to provide expedited discovery to Purkey to support a claim that ultimately is not properly before the Court.

**III.    Purkey has failed to demonstrate entitlement to expedited discovery.**

As Purkey correctly observes, courts have applied two different tests to determine whether to grant expedited discovery: "the *Notaro* [*v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982)] test and the reasonableness, or good-cause, standard." *Attkisson v. Holder*, 113 F.Supp.3d 156, 162 (D.D.C. 2015). More recently, judges in this District "have rejected entirely the *Notaro* test in favor of the good-cause standard, which is 'more suited to the application of the Court's broad discretion in handling discovery.'" *Id.* (quoting *Guttenberg v. Emery*, 26 F.Supp.3d 88, 97-98 (D.D.C. 2014)). Under either test, this Court should deny Purkey's request.

"Courts typically consider five factors when evaluating a motion for expedited discovery under the good-cause standard: '(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.'" *Id.* (quoting *Guttenberg*, 26 F.Supp.3d at 98).

The first factor appears to weigh in Purkey's favor, as he has filed a motion for a preliminary injunction. As discussed above, however, Purkey also filed a motion for a preliminary injunction and expedited discovery in December 2019 and moved to withdraw that motion only two weeks later. ECF Nos. 7, 11. Though Defendants acknowledge their position that this Court's injunction in another case mooted his *Ford* claim, Purkey did not agree with that

position and nothing required him to withdraw his motion for expedited discovery six months ago. For this reason, the Court should not give great weight to the first factor.

The second factor weighs in the Defendants' favor because Purkey's "proposed discovery requests are not narrowly tailored," but "instead seek significant discovery on the merits." *Attkisson*, 113 F.Supp.3d at 162. This Court has rejected a request for expedited discovery in part because the "discovery requests are not narrowly tailored to reveal information related to the preliminary injunction as opposed to the case as a whole." *Guttenberg*, 26 F.Supp.3d at 98.

The relevant questions for the preliminary injunction are first, and most importantly, whether Purkey may bring his *Ford* claim in this Court. If and only if this Court determines that he may, the next questions become whether Purkey has shown a likelihood of success on the merits of his due process and *Ford* claims. The first two issues, which present the legal questions of whether this case can proceed in this Court and whether any right to pre-*Ford*-claim discovery exists, require no discovery to resolve. And because Purkey fails on his due process claim, he cannot succeed on his request for discovery to make a substantial threshold showing on the *Ford* claim itself.

Even if the Court disagrees, the second factor counsels that it should not grant the full scope of discovery Purkey requests because his requests are not narrowly tailored to his *Ford* claim. While Purkey's request for medical and psychological records may bear on that question, much of his requested discovery is substantially overbroad and some of it is not relevant at all. Purkey's requests for multitudinous diagnostic imaging, scans, and a lumbar puncture, for example, are not narrowly drawn to answer the question of whether Purkey understands that the Government intends to execute him for his kidnapping, rape, murder, and dismemberment of a 16-year-old girl and will serve only to require lengthy delays for off-site procedures. Similarly, a

-7-

year's worth of video footage of Purkey's cell, even if it were available and discoverable, would take months to review, would reveal nothing about Purkey's understanding of why he will be executed, and would reveal sensitive law enforcement information.

With regard to Purkey's request for "[i]nformation about the BOP's ability to protect experts and legal visitors from COVID-19," Discovery Mot. at 3, that information is not discoverable in this case. Fed. R. Civ. P. 26 ("Parties may obtain discovery regarding any nonprivileged matter that *is relevant to any party's claim or defense . . .*."). The information Purkey seeks on that topic does not even go the merits of his *Ford* claim; rather, it is information about the BOP's procedures for visits during the current pandemic. That information is even less narrowly tailored to the resolution of Purkey's motion for a preliminary injunction under *Attkisson*.[1]

The third factor weighs in Defendants' favor. The third factor weighs in favor of expedited discovery where "the plaintiff will be irreparably harmed without expedited discovery" and "the plaintiff seeks to 'gain evidence to get the court to preserve the status quo.'" *Attkisson*, 113 F.Supp.3d at 164. Defendants concede that any harm Purkey would suffer if this Court denies his motion would be irreparable, but do not agree that denial of his motion would cause any harm where this Court can dismiss his complaint for failure to state a claim without any of the information he has requested.

---

[1]After Purkey received the latest notice of an execution date, his counsel reached out to the BOP regarding scheduling in-person visits. Siereveld Decl. Exh. B. The BOP invited Purkey's counsel to schedule whatever visits it thought appropriate. *Id.* Purkey's counsel instead requested an increasing amount of information as a pre-condition for scheduling those visits. Siereveld Decl. Exhs. A, B. The BOP attorney explained that much of the requested information is public and provided an explanation as to what BOP's safety protocols would be. Siereveld Decl. Exhs. A, B, C.

The fourth factor, the burden on Defendants to comply with the requests, weighs in Defendants' favor. Purkey seeks substantial diagnostic testing and almost one year's worth of video footage, both of which will impose substantial burdens on the BOP. In recent correspondence, his counsel have even suggested that the Defendants must bear the cost for medical procedures that BOP medical staff believe are not medically necessary. Siereveld Decl. Exh. A; Watson Decl. ¶¶ 5-6. In addition, revealing the video footage will reveal law enforcement sensitive information related to the security of the Terre Haute facility.

The fifth factor weighs in the Defendants' favor. Purkey presents his motion prior to a ruling on the motion to dismiss, a practice that "is often disfavored." *Attkisson*, 113 F.Supp.3d at 165. "Even filing a motion for expedited discovery after briefing of motions to dismiss has concluded is 'well in advance of typical discovery.'" *Id.* (quoting *Landwehr v. F.D.I.C.*, 282 F.R.D. 1, 4 (D.D.C. 2010)). This Court has previously discussed the pendency of a motion to dismiss as the factor "most important for the Court's reasonableness analysis," writing that "requiring defendants (who have raised several arguments as to why plaintiffs' complaint should be dismissed) to expend significant resources in responding to plaintiffs' discovery requests would be unjust—even more so because plaintiffs' discovery requests go to the merits of the dispute." *Guttenberg*, 26 F.Supp.3d at 99.

Purkey also fails the more stringent *Notaro* test. In *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982), the court articulated a "stringent standard," *In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 142 (D.D.C. 2005), where the plaintiff must show

> (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.

*In re Fannie Mae*, 227 F.R.D. at 142 (quoting *Notaro*, 95 F.R.D. at 405).

Here, Purkey fails to demonstrate both the second and third prongs of the *Notaro* test. As discussed at length in Defendants' response to Purkey's renewed motion for preliminary injunction, Purkey has failed to make the substantial threshold showing required to obtain any process or discovery and has further failed to allege plausible facts demonstrating his entitlement to relief. Furthermore, as discussed above, Purkey has failed to demonstrate a connection between the expedited discovery he requests and the avoidance of the irreparable injury.

## CONCLUSION

For the foregoing reasons, this Court should deny Purkey's motion for expedited discovery. If the Court determines to grant the motion in whole or in part, it should not order wholesale production of the materials Purkey seeks. As Defendants discuss above, much of the discovery Purkey requests would be irrelevant, burdensome to produce, and would reveal sensitive law enforcement information. Defendants expressly preserve all objections that they might have to this discovery if propounded in the ordinary course. If this Court orders any discovery in this case, it should require the parties to meet and confer about the scope of discovery, logistical issues, and issues related to the security and safety of the Terre Haute facility. Furthermore, if this Court grants this motion in whole or in part, it should permit Defendants to seek from Purkey corresponding discovery relevant to his renewed preliminary injunction motion.

-10-

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

By     /s/ *J. Benton Hurst*

BRIAN P. CASEY
KATHLEEN D. MAHONEY
J. BENTON HURST (D.D.C. Bar #MO009)
DAVID WAGNER
Special Assistant United States Attorneys

Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri  64106
Telephone: (816) 426-3122
Fax: (816) 426-5186
E-mail:  Brian.Casey@usdoj.gov
        Kate.Mahoney@usdoj.gov
        John.Hurst@usdoj.gov
        David.Wagner@usdoj.gov

*Attorneys for Defendants*

-11-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WESLEY I. PURKEY,               )
                                         )
           Plaintiff,          )
                                         )
           v.                )   Civil No. 19-03570 (TSC)
                                       )
WILLIAM P. BARR, et al,      )
                                       )
           Defendants.      )

## Declaration of Katherine Siereveld

I, Katherine Siereveld, declare the following:

1.     I am a senior attorney employed with the Federal Bureau of Prisons at FCC Terre Haute.

2.     Attached to this declaration as Exhibits A, B, and C are true and correct copies of email correspondence between me and Wesley Purkey's attorney, Rebecca Woodman.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _6/29/2020_

_____
Katherine Siereveld

# Exhibit A

| | |
|---|---|
| **From:** | Katherine Siereveld |
| **To:** | Rebecca Woodman |
| **Cc:** | Rick Winter; MichelleLaw; Brian Fleming; ChasMcAleer; Casey, Brian (USAMOW) |
| **Subject:** | Re: Purkey- expert visitation |
| **Date:** | Friday, June 26, 2020 12:34:21 PM |

Hi Rebecca,

I think there may be some confusion regarding the COVID-19 testing data you are seeking. You are correct that the BOP webpage did not initially have detailed data about the testing, but that is no longer the case. If you scroll to the section after the facility-by-facility breakdown of active cases, you will see a section which details the numbers of completed tests, pending tests, and positive tests. That data is shown both in the aggregate and for each facility. The data is further explained on the webpage under the heading "About the Data" which I have copied here:

*About the Data*

*These data are compiled from a variety of sources and reviewed by BOP Health Services staff before documented for reporting. **Not all tests are conducted by and/or reported to BOP**. The number of positive tests at a facility is not equal to the number of cases, as one person may be tested more than once. The number of tests recorded per site reflects the number of persons at the specific facility who have been tested, whether at that site or at a prior facility.*

As for the sanitation stations, yes, those include hand sanitizer and individual sanitizing wipes liberally available at points between the front entrance and the SCU. This is obviously in addition to the soap and water provided in the restrooms, and any additional sanitizer you wish to request from staff. The individual visiting rooms are wiped down before and after visits. Additionally, to the extent possible, we are attempting to assign visiting spaces to each inmate. For example, we have 3 non-contact visiting rooms and have so far only had social visits requested for 3 inmates. Until we have more than those three, our intent is to assign one visiting room to a particular inmate to further reduce any possibility of cross-contamination.

I am unaware of any outstanding requests for medical and psychological records, but if you can let me know when and how you requested them, that can help me track them down. As a general rule, the two quickest ways to receive medical and psych files is for either your client to request a copy of his own records via a request to staff, which he can then forward to you; or, request those records through the discovery process.

With regard to the outside testing you are now requesting, we cannot provide you with specifics as to the logistics for security reasons. Once the tests are confirmed, we will be able to advise that one or more facilities will be able to conduct the testing you have requested within the diagnostic parameters you have outlined. You will receive the results which will have the names of the facilities and medical personnel as part of the records. To that end, I will let you know if any additional information is required to successfully schedule those tests.

The BOP does not pay for unnecessary outside tests on inmates which are not clinically indicated. Per our medical and psychology staff, a review of Mr. Purkey's records reveals no

clinical indication for the testing you are requesting.  Our medical and psychology staff simply cannot order testing which they do not believe is necessary to the care of that individual. Please let us know how you would like to proceed.

Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/25/2020 8:39 PM >>>
Hi Katherine:

Thank you for your emails dated June 24, 2020 (4:26 p.m.) and today at 1:02 p.m.  In response, and further to my prior emails on this topic, including in particular my email dated June 20, 2020 (12:55 p.m.), I respond as follows.

Once again, your plan for visits at USP Terre Haute, which appears to be materially unchanged from the plan that was implemented prior to the COVID-19 lockdown, remains insufficient to address our concerns.

As I have stated numerous times, in order for us to make informed decisions about the safety of any visitation at USP Terre Haute – whether by Mr. Purkey's legal counsel, expert witnesses, spiritual advisors, friends or family members -- we need much more information. The critical nature of the associated risks and the essential role of data to make safety determinations should come as no surprise to you.  Indeed, the need for extensive information to evaluate COVID-19 related health risks in prisons is the subject of virtually daily court opinions (*see* the attached June 18, 2020, decision by the U.S. District Court for the District of Columbia) and media exposes.  *See* T. Thomas, "How U.S. Prisons Became Ground Zero for Covid-19," *Politico* (June 25, 2020), https://www.politico.com/news/magazine/2020/06/25/criminal-justice-prison-conditions-coronavirus-in-prisons-338022.

For example, you still have not provided all the testing data we and our experts need to evaluate the risks associated with visitations and to develop necessary mitigation risks. We are well aware of the COVID-19 statistics reporting the  number of confirmed positive cases posted on BOP's website. We are requesting critical contextual information about those positive numbers, including information about the numbers of tests administered, the number of pending test results, and the numbers of positive and negative results.  We have requested this information from you and in our court filings, but the answers have still not been forthcoming.

Additionally, we have no information from you at this time about sanitation, the frequency of surface cleaning and disinfecting throughout the buildings from the front door entry point to the visitation booths, and I have no idea what you mean when you refer to "sanitizing stations." Is that shorthand for the hand sanitizer you've mentioned in our previous correspondence? Nor is it clear what you mean by "successful visiting for the inmates who have execution dates" – since COVID-19 has a 2-14 day incubation period following exposure to the virus, the mere fact that a visitation has taken place is in no way an indicator of "success," however defined.  (It is worth noting that the apparent continued prohibition on visitations with prisoners at USP Terre Haute who are not facing execution is proof enough of the high risk to which prisoners, staff and visitors are exposed at the prison.  "Excepting"

certain prisoners for pre-execution visitations does not preclude that risk.)

Leaving aside what your willingness and apparent ability now to grant Mr. Purkey an exception to be tested says about your previous insistence on a court order (which we sought but were denied in prior litigation because there was not a *Ford* claim pending, which there now is in federal district court), many questions remain before we can go forward with any testing. Specifically, we need to know the precise logistics of accomplishing the testing in the short time period available. In which hospital will the testing take place? Does the hospital have the equipment and personnel available to conduct the blood tests, MRI, DTI, two types of PET scans (one using a radioactive tracer to measure glucose metabolism in regions of the brain , and a second measuring the deposition of an abnormal protein in the brain called amyloid-b), and EEG that we are requesting? We need to know the logistics of transporting our client for the testing, e.g., how will it be done safely, when it can be done, what steps need to be taken in order to facilitate transportation, such as what sort of paperwork will be required?

With respect to the issue of blood tests, and given that Mr. Purkey will need to be transported to a hospital for the necessary imaging tests, it seems unnecessary for prison staff to conduct the necessary blood tests, which can be performed by hospital staff.  However, to respond to your inquiry, the necessary blood tests would include the following (please excuse any layperson imprecision):

Complete Blood count and differential;
Fasting blood glucose;
Liver function tests AST ALT GGT;
Bilirubin level;
Renal function (BUN and creatine);
Thyroid;
Lyme;
Syphilis;
HIV;
B12; and
Folate.

Finally, we are not prepared to accept your denial of responsibility for the costs of testing, particularly your apparent justification that the requested testing is not "clinically indicated."  We have submitted substantial evidence in the pending *Ford* litigation to demonstrate that such testing is, in fact, warranted and clinically indicated, regardless of how such testing might also inform adjudication of the pending litigation.  That conclusion will become even more evident when we and our experts are able to review Mr. Purkey's complete medical records and video surveillance records, which we have been repeatedly requesting and which have been withheld from us.  Indeed, those records may demonstrate in further detail that the requested testing has been "clinically indicated" for some time but not administered by the Bureau of Prisons.

In closing, having confirmed for you the necessary blood tests and imaging that need to occur, we will await the details regarding how that testing will be implemented.  We will also await the full scope of COVID-19 related information we have requested and, whether extant or not, the details of all of the safety protocols necessary to protect the health of Mr. Purkey, prison staff and visitors given the

COVID-19 statistics and conditions of the prison, on the basis of which we and our experts can determine whether and under what circumstances visits with Mr. Purkey can be scheduled and safely conducted.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Thursday, June 25, 2020 at 1:02 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Rick Winter <rwinter@bop.gov>, Brian Fleming <bfleming@milchev.com>, Chas McAleer <CMcAleer@milchev.com>, Brian Casey <Brian.Casey@usdoj.gov>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
I have re-attached the email chain between Michelle Law and myself regarding the costs of the different tests which were discussed at that time. As a reminder, the BOP cannot order or pay for testing which is not clinically indicated. I am working to confirm that those costs are consistent with what they would be today. The security costs will likely remain the same, but I am running that to ground as well. Please let me know as soon as possible the specific parameters of the additional testing which was not previously identified so I can get cost estimates to you and we can begin scheduling.
Thanks,
Katherine

>>> Katherine Siereveld 6/24/2020 4:25 PM >>>
Hi Rebecca,

As discussed in our prior emails, the BOP's plan for legal visits can be found on the BOP website, https://www.bop.gov/coronavirus/covid19_status.jsp. Additionally, the Terre Haute specific numbers you requested can be found here: https://www.bop.gov/coronavirus/. I also advised that masks are to be worn at all times in the facility. If you do not have a mask, one will be provided to you. Additionally, we have sanitizing stations available and plexiglass has been installed in the contact visitation booth. We have already begun successful visiting for the inmates who received execution dates. It is unclear what additional protocols you are seeking.

In the email chain you attached between Ms. Law and I, it was clear that she was seeking a court

order. While it is still our position that any medical or psychological testing which is not clinically indicated (such as this) requires a court order, we recognize the urgency of the time frame and are willing to make an exception if you did not yet obtain a court order as indicated in the email from 10/4/2019 unless an order was issued denying your request for the outside testing. Did the Court deny your request or was an order not sought?

BOP staff will not perform any of these tests. All of the requested tests would need to be performed by outside medical personnel. The only exception might be the blood tests. BOP personnel would likely draw the blood and then send to an outside lab for the requested tests. Do you have a list of the tests? I believe the two attached orders are all that I have from October 2019.

Finally, I will be in a deposition tomorrow so you will likely receive an out of office reply from me. I will still have access to email and can step out to call if necessary.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

>>> Rebecca Woodman <rewlaw@outlook.com> 6/24/2020 9:30 AM >>>
Dear Katherine:

We are waiting for the BOP written safety plan/protocol/policy relating to COVID-19 in order to determine if and when it is safe to schedule an expert visit. I have requested these written materials several times now, and I renew my request here. I appreciate that BOP now appears to be open to testing by our experts after previously refusing to allow this type of testing without a court order. (See attached email correspondence.) Does this constitute a reversal of BOP's prior position? In addition, were such testing to be performed by BOP personnel, we would first need information about who would be administering the tests, the precise equipment that would be used, and the qualifications, training, and experience of the personnel who would be administering the following tests that we require:

1. An MRI with and without contrast,

2. Two types of PET scans

3. An EEG

4. A variety of blood tests

5. A lumbar puncture and cerebrospinal fluid assays (spinal tap)

6. A DTI scan

Please provide the requested information on or before close of business on Friday, June 26, 2020, so that we can make an informed judgment about scheduling expert visits.

Best,

Rebecca


Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com


---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 23, 2020 at 12:48 PM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Purkey- expert visitation

Hi Rebecca,
Just following up on this.  I know we discussed expert visits during our conversation, but I don't recall if you have made arrangements for Dr. DeRight to come to the institution?  I did not see any follow up information on these specific issues.  I went ahead and had our Medical start working on getting him scheduled for an MRI and EEG, but we will need the parameters the doctor is looking for in addition to the specific blood work he needs.
Thanks,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/15/2020 9:38 AM >>>
Dear Katherine: As you know, our expert neuropsychologist, Dr. Jonathan DeRight, conducted an in-person evaluation of Mr. Purkey last year and found that Mr. Purkey suffers from Alzheimer's disease, a progressive dementia. Because it has been more than a year since Dr. DeRight last evaluated Mr. Purkey, it is essential that Dr. DeRight conduct an in-person follow-up evaluation to obtain a current assessment of Mr. Purkey and extent of progression of his disease, and we would like to schedule this

evaluation as soon as possible. A letter that I received from Dr. DeRight requesting the in-person evaluation is attached. In addition, Dr. DeRight in his letter is requesting up-to-date neuroimaging and blood laboratory results, which are necessary to assessing Mr. Purkey's current abilities and disease progression. I recall that we have discussed ways to accomplish brain imaging tests previously, and we would like to be able to arrange such testing in conjunction with Dr. DeRight's evaluation.

Please let me know of upcoming dates and times for Dr. DeRight to visit Mr. Purkey at USP-Terre Haute to conduct an evaluation, and the logistics of scheduling the requested brain imaging. And please don't hesitate to contact me if you have any questions. Thanks so much.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

# Exhibit B

| From: | Katherine Siereveld |
| --- | --- |
| To: | Rebecca Woodman |
| Cc: | Michelle Law; Brian Fleming; Chas McAleer; Casey, Brian (USAMOW) |
| Subject: | Re: Execution notice for Wesley Purkey |
| Date: | Monday, June 22, 2020 8:29:23 AM |

Good morning,

I do not have any information with regard to the scheduling of Mr. Purkey's execution, nor the selection of the date.  However, I am happy to continue to try to facilitate visitation for you, other members of your legal team, and any necessary experts.  As you are aware, the BOP website makes it clear that case-by-case exceptions for in-person legal visits are permitted, so long as the visiting attorney undergoes the same screening procedures as the staff.  SCU staff have advised that you did not request an exception when your standing legal visit was canceled.  Ms. Law currently has a visit scheduled for July 10, but that is the only request we have from your team, to date.  The visiting information can be found here:  https://www.bop.gov/coronavirus/covid19_status.jsp.

Additionally, Terre Haute specific information regarding the virus can be found here: https://www.bop.gov/coronavirus/.  This includes testing numbers.

The regular SCU contact visiting room is ready to receive visits.  Plexiglass has been installed in one of the contact booths, while still leaving a pass-through space for the exchange of paperwork, if necessary.  Please do not hesitate to contact a member of the SCU unit team to schedule your visits.  As we have discussed before, non-contact social visiting has also resumed in the SCU for those inmates with scheduled execution dates.

Thanks,
Katherine


Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476


>>> Rebecca Woodman <rewlaw@outlook.com> 6/20/2020 12:55 PM >>>
Dear Katherine:

Thank you for your email regarding the issue of access to and visits with Mr. Purkey.  We have several initial reactions.

First and foremost, we believe the decision to schedule Mr. Purkey's execution in the middle of a global pandemic, at a time when many states are experiencing severe outbreaks of the COVID-19 virus and prisons in particular are veritable breeding grounds for the COVID-19 virus, is really outrageous and unreasonable.  The decision seems designed to deny Mr. Purkey the basic rights to which he is entitled under the circumstances.  The fact that the decision to do so was made notwithstanding the pendency of litigation over Mr. Purkey's constitutional rights is particularly disturbing.

Second, the relatively short notice given for his execution, i.e., 30 days, is patently unreasonable given all of the visitations, examinations and tests that would need to be completed for purposes of the

pending litigation and/or in advance of an execution even were there no pandemic.  The logistical and scheduling complications caused by the coronavirus pandemic make the decision to proceed with the execution on this accelerated timeline unconscionable.

Third, making the decision to execute Mr. Purkey and providing such short notice before the Bureau of Prisons had developed a comprehensive, written plan, policy or procedure to ensure timely and safe visits during the pandemic and thus protect inmates, staff and visitors alike is utterly reckless.  Semantics aside, you repeatedly promised this week to provide us a "writing" that would set forth in detail the precise safety protocol to protect counsel, our experts, spiritual advisors, family members, and any other person for whom access to Mr. Purkey will be crucial in the next few weeks leading up to and including the execution.  You still have not done so.  Sequential comments in emails (such as your reference today to the possible installation of a sheet or sheets of plexiglass in one room of the prison 10 days into the 30-day execution notice period) does not come close to meeting the Bureau's legal, ethical and moral obligations to provide for the safety of inmates, staff and visitors, assuming any safety procedures would be sufficient to do so during this pandemic.  Moreover, your email comments do not even begin to address all logistical and physical aspects implicated by a visitation to an inmate.  Indeed the absence of such a plan, policy or procedure also would seem to render impossible attendance at the execution of all required persons**.**

Fourth, your repeated encouragement this week that we can and should schedule visits seems more like a disingenuous suggestion that visitations are possible, safe and feasible at this time, particularly since your own website adamantly states that "All visiting at this facility has been suspended until further notice."  The last time you made us such assurances, your staff informed us otherwise, cancelling and/or refusing to schedule visits. Are all inmates capable of receiving visitations at this time, or is the decision to allow visits to Mr. Purkey simply a special "accommodation" to him individually to facilitate your desire to execute him on July 15?

Fifth, your statements regarding the availability of visits to Mr. Purkey is further meaningless given the Bureau's continued failure and refusal to provide us the records and information we have been requesting for months (through FOIA and otherwise) – records that would need to be received and reviewed in advance of visits with and examinations of Mr. Purkey if those visits and examinations are to be meaningful and sufficient in any respect.  By continuing to withhold the requested information from us, you are deliberately ensuring that any visits with and examinations of Mr. Purkey will be impaired and inadequate.

Given the foregoing, your statements regarding the availability of visits with Mr. Purkey are simply not genuine, in good faith, reasonable, practicable, feasible or safe.  But even were it otherwise, we cannot begin to make evaluations about whether counsel and experts can safely visit Mr. Purkey without substantial additional information wholly apart from the safety plan, policy or protocol.  For example, we would immediately need information about the scope of the outbreak at the Terre Haute facility, including information about all testing conducted at Terre Haute within the last 30 days, including the number of individuals who requested tests, the numbers tested, and the results of those tests.  In addition, we need information about where the visitations will occur, the size of the plexiglass, the ventilation in that room, and any other protections the prison plans to offer. These are just two examples of much more information we would need to make informed decisions about

whether counsel and experts can safely visit Mr. Purkey, such as the availability of personal protective equipment (beyond a mask) to staff, Mr. Purkey, and visitors from our team; safety precautions taken within the pathways of travel to legal visits with Mr. Purkey generally and on the day of execution; sanitation and cleaning protocols between visits and between visitors; steps taken to ensure adequate ventilation within the prison; and much more.

Given the urgency of this matter and Mr. Purkey's upcoming execution, we request that you respond to this email (including with the information requested above) before Monday, June 22, 2020, at noon.

Sincerely,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Rebecca Woodman <rewlaw@outlook.com>
**Date:** Friday, June 19, 2020 at 10:04 AM
**To:** Katherine Siereveld <ksiereveld@bop.gov>
**Cc:** Michelle Law <Michelle_Law@fd.org>, "McAleer, Chas" <CMcAleer@milchev.com>, "Fleming, Brian" <bfleming@milchev.com>, "Casey, Brian (USAMOW)" <Brian.Casey@usdoj.gov>
**Subject:** Re: Execution notice for Wesley Purkey

Dear Katherine:

I wanted to follow up on our telephone conversation and emails of Tuesday, June 16, 2020. Specifically, you indicated both in your emails and on the phone that written policies to ensure full access to our client, Wes Purkey, who is scheduled to be executed on July 15, 2020, for legal, social, and spiritual visitation while also protecting the safety of our team members, Mr. Purkey, and staff from COVID-19, were being developed and would be issued forthwith. In our telephone conversation on Tuesday, you stated that I would have those written policies within the next hour or two. In an email later in the day on Tuesday, you stated that I would have the written policies the following day. However, I have yet to receive any written policy.

The safety measures that you mentioned in our telephone conversation on Tuesday – temperature checks, questions about symptoms, a mask (either one's own or provided by the facility), and a preference for non-contact visits – are the same measures that were instituted at USP Terre Haute back in March 2020 when the impact of the COVID-19 pandemic was beginning to be felt in the United States. These measures were also instituted just before we were first notified on March 13,

2020 that all of our visits were cancelled until further notice and the prison went into full lockdown, and thus are obviously insufficient to ensure our safety and protection from COVID-19. The homepage of USP Terre Haute's website still prominently displays a banner stating that "All visiting at this facility has been suspended until further notice." BOP reports there has been one death from COVID-19 and five positive tests at USP Terre Haute, but I am aware of no regular testing regime of either prisoners or staff at the facility, and the known COVID-19 transmission rates in closed spaces like a prison is extreme.

Under the circumstances, we are concerned about the ability of USP Terre Haute to accommodate full access to our client while protecting the safety of ourselves, Mr. Purkey, and staff during the time up to and including the execution itself. In-person access to Mr. Purkey by ourselves and our experts is an essential part of our ability to effectively represent him, and is critical as he is facing an execution date in less than one month. We have been unable to conduct any in-person visitation with Mr. Purkey since March. At the same time, we have team members who are high risk because they are medically vulnerable to COVID-19 or who care for persons who are vulnerable to the virus.

Please provide by close of business today the written policies of measures to protect our safety and the safety of Mr. Purkey, while ensuring full in-person access to our client for legal, social, and spiritual visitation in the next now less than four weeks, up to and including the execution itself, as we need to schedule expert and legal visits immediately.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 2:43 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Andrew Sutton <asutton@bop.gov>
**Subject:** Re: Execution notice for Wesley Purkey

We are still working on a plan that will allow as much visitation as possible while still mitigating the risk of exposure to COVID-19. I will have something in writing for you by tomorrow, but you can begin to schedule your legal visits as soon as you wish. The normal schedule will remain the same (M-F, 8-3), we are working on the additional precautions re: COVID. Please note that vending will not be available. Mr. Sutton has been copied on this email and can assist you in scheduling.

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 2:00 PM >>>

Yes, you can call me at the number below.

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Tuesday, June 16, 2020 at 12:59 PM
**To:** Michelle Law <Michelle_Law@fd.org>, Rebecca Woodman <rewlaw@outlook.com>
**Subject:** Re: Execution notice for Wesley Purkey

Hi Rebecca,
We do not have anything written yet but I am working on it. Is there a number I can call you at and I can let you know what the plan is?
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/16/2020 1:58 PM >>>
Dear Katherine: I am interested in knowing what arrangements are being made with respect to access to our client in terms of legal, social, and spiritual visits going forward, given the Covid situation. Are there written policies in this regard? If so, I would like to see them. The BOP website, for example, states that "all visiting at this facility has been suspended until further notice," so I wonder how we are to proceed. In addition to any written policies, I am happy to discuss these matters further in a phone call if you would like to do so.

I would appreciate a prompt response in light of the brief window of time. Thank you.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

---

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Monday, June 15, 2020 at 4:48 PM
**To:** Michelle Law <Michelle_Law@fd.org>, "rewlaw@outlook.com" <rewlaw@outlook.com>

**Subject:** Execution notice for Wesley Purkey

Dear Michelle and Rebecca:

Please see the attached execution notice which was just provided to inmate Purkey.  I will be available tomorrow to discuss legal and social visits going forward.  Do not hesitate to let us know if you have any questions.

Thank you,
Katherine

Katherine N. Siereveld
Senior Attorney
FCC Terre Haute
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3476

# Exhibit C

| From: | Katherine Siereveld |
| --- | --- |
| To: | Rebecca Woodman |
| Cc: | Cassandra Stubbs; Michelle Law; Abigail Stokes; Brian Fleming; Chas McAleer |
| Subject: | Re: Execution notice for Wesley Purkey |

No worries at all.  I recognize this is a stressful time.  I have just been told that we should have plexiglass installed in the contact visiting booth by next Thursday.  If you need a visit before then just let me know and we will see what else we can do.
Thanks,
Katherine

>>> Rebecca Woodman <rewlaw@outlook.com> 6/19/2020 11:34 AM >>>
Katherine I sincerely apologize for my inadvertent email. Thank you for your quick response.

Best,
Rebecca

Rebecca E. Woodman
Attorney at Law, L.C.
1263 W. 72nd Ter.
Kansas City, Missouri 64114
(785) 979-3672
rewlaw@outlook.com

**From:** Katherine Siereveld <ksiereveld@bop.gov>
**Date:** Friday, June 19, 2020 at 10:22 AM
**To:** Rebecca Woodman <rewlaw@outlook.com>
**Cc:** Cassandra Stubbs <cstubbs@aclu.org>, Michelle Law <Michelle_Law@fd.org>, Abigail Stokes <astokes@milchev.com>, Brian Fleming <bfleming@milchev.com>, Chas McAleer <CMcAleer@milchev.com>
**Subject:** Re: Execution notice for Wesley Purkey

Hi Rebecca,

While I am certain you did not intend for me to receive the below email, please rest assured that I am available even when not in the office.

As we discussed earlier, I told you these would not be "policies" and that we were working as quickly as possible to work out a safe option to allow for as much of a contact visit as possible under the circumstances.  While I regret that we have not been able to send you more in writing as of yet, I encouraged you to schedule your visits with the unit team so that your schedule would not be adversely impacted.  Again, anyone coming on grounds will be screened at the front gate for any symptoms and have their temperature taken.  Once inside the lobby, we ask that masks be worn and sanitizer will be provided.  If you do not have a mask, we will be happy to provide one to you.  As we discussed, the only remaining factor is the actual amount of contact and distancing we are able to put in place for the visit.  We are able to offer non-contact visits any time you wish and are working on a

safe way to allow contact visits for document exchange purposes.  Please do not hesitate to contact SCU unit team to schedule a visit at your earliest convenience.

Take care,

Katherine


Katherine N. Siereveld

Senior Attorney

FCC Terre Haute

4200 Bureau Road North

Terre Haute, Indiana 47802

(812) 238-3476



>>> Rebecca Woodman <rewlaw@outlook.com> 6/19/2020 11:05 AM >>>

LOL - here is the response I got back from Katherine.


Rebecca E. Woodman

Attorney at Law, L.C.

1263 W. 72nd Ter.

Kansas City, Missouri 64114

(785) 979-3672

rewlaw@outlook.com



On 6/19/20, 10:04 AM, "Katherine Siereveld" <ksiereveld@bop.gov> wrote:

   I will be out of the office on Friday, June 19.  If you need immediate assistance, please contact Alexis McGee at x3496 or Jennifer Wrede at x3555.

   Thanks!

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

WESLEY I. PURKEY,           )
                                     )
         Plaintiff,       )
                                     )
      v.                   )    Civil No. 19-03570 (TSC)
                                     )
WILLIAM P. BARR, et al,    )
                                   )
        Defendants.    )

## Declaration of T.J. Watson

I, T.J. Watson, declare the following:

1. I am currently employed by the Bureau of Prisons (BOP) as the Complex Warden at the Federal Correctional Complex located in Terre Haute, Indiana (FCC Terre Haute), a position I have held since November 11, 2018. I have been employed by the BOP in areas of increasing responsibility since 1995.

2. The statements I make hereinafter are made on the basis of my review of the official files and records of the BOP, my own personal knowledge, or on the basis of information acquired by me through the performance of my official duties.

3. Inmate Wesley Purkey, in the Special Confinement Unit, is seen regularly by medical personnel, including a treating physician.

4. Attorneys representing Purkey have requested that he undergo several medical tests, including: an MRI with and without contrast; two types of PET scans; an EEG; a variety of blood tests; a lumbar puncture and cerebrospinal fluid assays; and a DTI scan.

5. Purkey's treating physician has reviewed Purkey's records and does not believe the tests mentioned above are medically necessary or clinically indicated.

-2-

6. The Bureau of Prisons will not pay for unnecessary medical tests, that is, tests that are not clinically indicated by Purkey's treating medical professionals.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___6/29/20___

T.J. Watson
Federal Bureau of Prisons

-2-